IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Case No. 1:26-cv-539

ARTHUR J. GALLAGHER & CO., and
ASSUREDPARTNERS OF COLORADO, LLC

        Plaintiff,

   v.

CINDY ACKERMAN JOHNSON,
VICKI WILLING,
AMANDA MACKIE, and
HUB INTERNATIONAL LIMITED

        Defendants.

---

## COMPLAINT

---

Plaintiffs Arthur J. Gallagher & Co. and AssuredPartners of Colorado, LLC ("**AP**") (collectively, "**Plaintiff**" or "**Gallagher**"), by and through its undersigned counsel, hereby brings this Complaint for injunctive relief and money damages against Defendants Cindy Ackerman Johnson ("**Ackerman**"), Vicki Willing ("**Willing**"), Amanda Mackie ("**Mackie**"), and HUB International Limited ("**HUB**") (collectively, "**Defendants**") (Ackerman, Willing, and Mackie collectively, "**Individual Defendants**") for violations of the Restrictive Covenants Agreements (the "**Agreements**," attached hereto as Exhibits A and B and incorporated herein by reference) between Gallagher on the one hand and Willing and Mackie on the other, as well as trade secret misappropriation, breach of the fiduciary duty of loyalty, tortious interference with Gallagher's contractual rights, and other claims. In support thereof, Gallagher avers as follows:

1

## INTRODUCTION

1.      Gallagher is in the business of providing insurance business solutions through trusted brokers. The deal that it makes with those brokers is that it will compensate them handsomely in return for the brokers providing loyal service during their employment and then not stealing customers and employees after the end of the relationship.

2.      Gallagher upheld its end of this bargain with Ackerman, paying her over $600,000 in 2025 and giving her an entire team of professionals to manage a vast book of personal insurance business containing over 1,800 lines and generating over $2.3 million in annual revenue (the "**Book**").  Ackerman has repaid this trust by breaching her obligations in every possible way. While still working for Gallagher, she aggressively recruited numerous co-workers to leave and join her at HUB, a direct competitor. Two of those co-workers – Mackie and Willing – joined her.

3.      Having assembled her team, Ackerman then led an effort to steal the Book on behalf of HUB, an effort that started while they were still Gallagher employees. Upon information and belief, the Individual Defendants reached out to one or more clients during their Gallagher employment to inform them of their move to HUB and to persuade them to move their business.  The Individual Defendants engaged in this surprise attack to get a head start on moving the Book to HUB, all for the benefit of Defendants collectively.

4.      The Individual Defendants resigned en masse on January 27, 2026. Ackerman then proceeded to increase her efforts to move the Book by reaching out the

clients in an effort to persuade them to move to HUB.  Given the number of clients at issue, it is virtually certain that Ackerman did so using trade secret information stolen from Gallagher as there is no way that she would have the contact and policy information for this vast assemblage of clients without having stolen a customer list.

5.      One possible means by which Ackerman stole Gallagher's trade secrets was through the use of a thumb drive, which she started using on November 11, 2025, stopped using December 19, 2025, and did not return at the end of her employment. Based on the files that Ackerman was accessing while using the thumb drive, it is likely that she moved trade secret documents to it and then retained them after the end of her employment.

6.      Moreover, both Mackie and Willing are subject to the Agreements, which prohibit them for a certain period of time from soliciting, servicing, or accepting business from the clients in the Book. The Individual Defendants have engaged in a collective effort to solicit those customers, selling themselves as a cohesive team and all in violation of the Agreements. The Broker of Record letters ("**BOR**") that Gallagher started receiving for clients in the Book reflect that Mackie and/or Willing are involved in the efforts to move the business or at least that Ackerman is involving them in the pitches so as to sell the clients on the notion that they will get continuity of service.[1]

---

[1]      A BOR letter is a formal document, typically on company letterhead, that authorizes an insurance carrier to replace an existing agent/broker with a new one to manage specific insurance policies. In practice, the receipt of this letter informs a broker like Gallagher that a client is moving its business to a different broker.

3

7.     Taken together, Defendants' behavior has been illegal in numerous respects.  The Individual Defendants flagrantly violated their duties of loyalty to Gallagher by soliciting clients and co-workers before resigning.   Likewise, they have misappropriated Gallagher trade secrets as a part of their frantic efforts to move the Book. Finally, Mackie and Willing have violated their contractual promises and Ackerman has participated in those violations at every step of the way.

8.     HUB shares the blame for these repeated acts of unfair competition. Gallagher has made it aware of the actions of its new employees and it has done absolutely nothing to ensure that they comply with their basic obligations. HUB would rather profit from the movement of the Book than do anything to ensure that a competitor's rights in its trade secrets and client relationships are respected.

9.     Having failed to resolve these issues without court involvement, Gallagher has no choice but to file this action. Gallagher is seeking injunctive relief to ensure that Mackie and Willing comply with their contractual requirements and that Defendants do not continue to misappropriate its trade secrets.   Gallagher requires injunctive relief because the damages that Defendants are doing and will continue to do absent court involvement are irreparable. Gallagher cannot put a complete price tag on the value of the relationships and confidential information that Defendants are stealing, which is why the trade secret statues and the Agreements all provide for injunctive relief in exactly this situation.

10. Gallagher is also seeking to be made whole for its losses, namely through compensation for its lost revenues and Defendants' unjust enrichment, as well as recovery of its attorneys' fees and other forms of monetary relief.

11. Gallagher is not seeking to prevent the Individual Defendants from working for HUB. It endorses free and fair competition. What it cannot tolerate is a collection of employees who violate their fiduciary duties, breach their Agreements, and use trade secrets in order to take the Book.

## PARTIES AND JURISDICTION

12. Plaintiff Arthur J. Gallagher & Co. is an entity organized under the laws of the State of Delaware with its principal place of business in Rolling Meadows, Illinois, and includes its subsidiaries, divisions, affiliates, and related companies (including AssuredPartners). AJG is a global insurance brokerage and risk management firm offering, among other things, property and casualty insurance services, bond and surety placements, and employee benefits insurance consulting to companies across many industries.

13. Plaintiff AssuredPartners of Colorado, LLC is a Colorado limited liability company, and its sole member and owner is AssuredPartners Capital, Inc., a Delaware corporation with its principal place of business in Orlando, Florida. AJG acquired AssuredPartners in August 2025 when it acquired AssuredPartners' parent company in a stock purchase agreement. As part of the stock purchase agreement, AJG assumed the right to enforce employment agreements between AssuredPartners and retained

5

employees, including Individual Defendants. AssuredPartners continues to operate as an AJG subsidiary and also has the right to enforce agreements with employees.

14. Willing is an individual who, upon information and belief, is a resident of Colorado, living at 22456 East Plymouth Circle, Aurora, Colorado 80016.

15. Mackie is an individual who, upon information and belief, is a resident of Texas, living at 5729 Copper Vista, New Braunfels, Texas 78132.

16. Ackerman is an individual who, upon information and belief, is a resident of Colorado, living at 3516 Akron Street, Denver, Colorado 80238.

17. HUB is a Delaware corporation with its principal place of business located at 150 N. Riverside Plaza 17th Floor, Chicago, Illinois 60606. HUB describes itself as a "leading North American insurance brokerage that provides employee benefits, business, and personal insurance products and services." As such, it is a direct competitor of Gallagher.

18. This Court has personal jurisdiction over the Individual Defendants because they are residents of Colorado and because the Individual Defendants have engaged in unlawful conduct in Colorado and in this judicial district, which has caused harm and will continue to cause damages to Gallagher in Colorado.

19. This Court has personal jurisdiction over HUB because it regularly conducts business in Colorado and thus has continuous, systematic, and substantial contacts with Colorado, including having hired the Individual Defendants to work for HUB in Colorado. HUB also committed unlawful acts directed at Gallagher in Colorado that have caused and will continue to cause damages to Gallagher in Colorado.

6

20.    This court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Gallagher is asserting a claim pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836.    The Court also has supplemental or pendent jurisdiction over Gallagher's remaining claims pursuant to 29 U.S.C. § 1367 because they form part of the same case or controversy as the federal question claim.

21.    Venue is proper in this Court because Defendants regularly conduct substantial business activities in Colorado and because Gallagher's causes of action arise, in whole or in part, in Colorado.

**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

**I.    Background and Business of Gallagher**

22.    Founded in 1927, Gallagher is a leading insurance brokerage firm – that is, it facilitates the sale of insurance policies between insureds (those buying the insurance) and insurance carriers (those selling insurance).

23.    As an insurance brokerage, Gallagher relies upon and invests heavily in the success of its individual insurance producers. These producers leverage their experience, expertise, and Gallagher's national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients.    Repeat business through insurance renewals from existing clients is of paramount importance to the success and growth of Gallagher. Gallagher invests in its producers to ensure they continue to nurture and develop the Gallagher book of business assigned to and/or generated by an individual producer.

## II.    Gallagher's Trade Secrets

24.    Equally critical to Gallagher's success, however, is its investment into the development and safeguarding of the confidential and trade secret information central to the business platform. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, Gallagher protects its prized assets – the trade secret and confidential information acquired and developed through continued investment.

25.    Gallagher devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Gallagher. The compilation and combination of this information is secret and provides Gallagher with a competitive advantage.  As alleged herein, Gallagher treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**Gallagher Trade Secrets**"), including:

a.    Certain non-public information concerning Gallagher clients, prospective clients, customer and prospective customer points of contact and contact information, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements;

b.    Gallagher's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods;

c.     the specific services and products offered by Gallagher to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks; and

d.     Personal identifying information, job history, qualifications, training, specialties, strengths, weaknesses, evaluations, client contacts, contractual obligations, pay data, salary and commission information, job responsibilities, account responsibilities, client satisfaction, employee turnover or retention, or other business-related information of Gallagher employees.

26.    Gallagher developed, compiled, and acquired its Trade Secrets at great expense and through substantial efforts. Gallagher's Trade Secrets are not readily ascertainable in the insurance industry or in any type of trade or public directory or any other source.

27.    The misuse of Gallagher's Trade Secrets, whether through the improper disclosure or improper use for a non-Gallagher business purpose, would cause significant damage to Gallagher through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

28.    As such, Gallagher takes careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of Gallagher Trade Secrets.  Gallagher has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees Gallagher's need to keep this information

a secret; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Gallagher; (c) having employees execute confidentiality and non-disclosure agreements that instruct Gallagher's employees not to disclose, reproduce or use this information without Gallager's consent; (d) distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on Gallagher's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Gallagher's computer system, servers, and networks, encrypting Gallagher's laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

29.    Gallagher also guards the confidentiality of its Trade Secrets by enforcing its contracts protecting its Trade Secrets.  Gallagher does not tolerate violations of confidentiality provisions and takes steps to enforce its rights, from cease-and-desist letters to litigation seeking emergency or preliminary and permanent injunctive relief, when, for example, producers violate their employment and post-employment confidentiality obligations. Gallagher has routinely enforced the terms of its employment agreements in recent years to protect against the use and disclosure of its Trade Secrets.

30.      Because of the nature of the Trade Secrets, Gallagher's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being secret, and the fact that the Trade Secrets cannot be readily ascertained from public sources by competitors, Gallagher's Trade Secrets are trade secrets under federal and state law.

31.      In the course and scope of Ackerman's duties as Senior Vice President, as well as in the course and scope of Willing and Mackie's duties as Private Client Account Executives, the Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Gallagher Trade Secrets from use and disclosure for a competitive purpose.

32.      The Individual Defendants predominantly worked with individuals and families on personal lines of insurance. As such, they worked with a large volume of clients whose contact and policy information is generally not publicly available – certainly not as a compilation – and therefore the clients lists that they used to do their jobs are especially important Trade Secrets.

III.    **Willing, Mackie, and the Agreements**

33.      Willing was hired by AP on July 1, 2014. Mackie was hired by AP on July 8, 2024.[2] As a condition of the commencement of their employments with AP, Willing and Mackie were required to sign the Agreements.

---

[2] At the time of her hire, Mackie lived and worked in Texas. Gallagher understands that she continues to live and work in Texas.

34.    Section 2 of both Agreements contain identical definitions of Confidential Information:

> (a)    For purposes of this Agreement, the term "Confidential Information" means all Trade Secrets and other information that is proprietary, private, and not generally known or accessible to members of the public or competitors of Company or Employer Group, whether or not in a written or recorded form, concerning the business or affairs of Company and/or its affiliates, subsidiaries, and parent companies and each of their respective successors and assigns (both individually and collectively as the context may require, the "Employer Group"), including but not limited to, information relating to:
>
> (i)    Employer Group's clients, prospective clients, acquisition targets, vendors, retail insurance brokers or agents, insurance carriers, insurance underwriters, and insurance wholesalers; or
>
> (ii)    Employer Group's financial condition, business costs, profits and losses, results of operations, marketing plans, business plans, operations, acquisition strategies, pricing, commissions, promotions, and business strategies and methods; or
>
> (iii)    services and products offered by Employer Group to its clients or prospective clients, including but not limited to, policy forms and information, policy types, rating information, premium amounts, expiration dates, renewal information, client preferences or needs, client and prospective client lists (including lists that contain specific, customized information about clients such as the identity or preferences of decision-makers, specialized requirements, habits, risk profiles, programs, purchase history and patterns, and overall insurance needs or preferences), information on risk characteristics, information concerning insurance markets for large or unusual risks and/or contracts or arrangements (including special terms and deals).

(Ex. A, § 2(a)(i-iii); Ex. B, § 2(a)(i-iii)).

35.    In the Agreements, Willing and Mackie committed that they would not take, copy, duplicate, use, or disclose AP's Confidential Information to any third party.  (Ex. A, § 2(b); Ex. B, § 2(c)). Mackie's Agreement provides that the duration of her non-disclosure obligation with respect to Confidential Information that is not a Gallagher Trade Secret is 18 months after the end of her employment with Gallagher. (Ex. B, § 2(c)).

36.    The Agreements also prohibit Willing and Mackie from soliciting, servicing, or accepting business from certain AP clients or prospects (as defined in Exs. A and B, § 3(b)-(d)) during and for a limited period after their employment:

3.  *Non-Solicitation & Non-Interference.*

(a)  Except on behalf of Company, during Employee's employment with Company and for twenty-four (24) months after Employee's employment with Company ends (whether voluntarily or involuntarily) (the "Restricted Period"), Employee shall not directly or indirectly through another person or entity:

(i)  offer, sell, solicit, quote, place, provide, or renew, any Insurance Products or Related

Services to any Restricted Client or Active Prospective Client; or

(ii)  service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client; or

(iii)  request, accept, facilitate, authorize, execute, send, process, or submit a broker of record or agent of record letter on behalf of any Restricted Client or Active Prospective Client, which would change the broker or agent of record for any Restricted Client or Active Prospective Client from Company to any other third party; or

(iv)  take any action intended, or reasonably likely, to cause any Restricted Client or Active Prospective Client, to diminish its business with, or cease or refrain from doing business with, any member of Employer Group; or

(Ex. A, § 3(a)).

3.  *Non-Solicitation & Non-Interference.*

(a)  Except on behalf of Company, during Employee's employment with Company and for the Restricted Period, Employee shall not directly or indirectly through another person or entity:

(i)  solicit, sell, provide or renew any Insurance Products or Related Services to any Restricted Client or Active Prospective Client; or

(ii)  service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client; or

(Ex. B, § 3(a)).

37.  Mackie's Agreement defines "Restricted Period" as 18 months after her employment with AP ends, whether voluntarily or involuntarily. (Ex. B, § 2(c)).  Willing's Agreement defines "Restricted Period" as 24 months after her employment with AP ends, whether voluntarily or involuntarily. (Ex. A, § 3(a)).

13

38. Mackie's Agreement also explicitly provides that "indirectly" means to knowingly and purposefully accomplish through others what Employee cannot accomplish directly without violating a covenant in her Agreement (Ex. B, § 3). Mackie further promised that she would not engage in any subterfuge to circumvent her non-solicitation obligations and that she could not contact customers covered by her restrictive covenants with or through other persons or entities. (*Id.*).

39. Willing and Mackie additionally agreed that AP would be entitled to injunctive relief were they to violate the provisions of the Agreements. (Ex. A, § 6; Ex. B, § 7).

40. Finally, Willing and Mackie agreed that if they breached the contract, then AP would be entitled to recover its attorneys' fees.  (Ex. A, § 20, Ex. B, § 19).

41. AP's rights under the Agreements inured to Gallagher following Gallagher's acquisition of AP.

## IV.    The Individual Defendants' Duties with AP.

42. At the time of her resignation, Ackerman was employed by Gallagher as a Senior Vice President, Personal Lines.

43. In her Vice President role, Ackerman was responsible for developing new business, maintaining existing relationships, supervising employees, and generally helping to manage Gallagher's operations in Colorado,

44. Ackerman's duties for AP included: (a) the use of sales techniques to identify prospects; (b) engaging in frequent communications with Gallagher clients to build relationships and address those clients' insurance needs; (c) working on renewal and

marketing strategies; and (d) developing relationships with carriers by becoming familiar with and executing strategies developed for satisfying carrier goals and objectives, as well as participating in carrier sponsored activities.

45.    Ackerman worked closely with Willing and Mackie to service Gallagher's clients.  The close coordination of these team members was essential for the proper servicing of clients, as it takes multiple co-workers with specific knowledge on the special insurance needs of clients in order to address the needs of those clients.

46.    In their positions as Private Client Account Executives, Willing and Mackie were also exposed to a large number of Gallagher's clients. Willing and Mackie were responsible for assisting Ackerman with soliciting potential clients and servicing Gallagher's current clients.  Willing and Mackie routinely worked with Gallagher's Trade Secrets in order to take care of the clients in the Book such that the Agreements are necessary to protect those Trade Secrets from being used in unfair competition against Gallagher's interests.

47.    Collectively, the Individual Defendants worked to take care of the insurance needs of the clients in the Book. This entailed constant contact by phone, email, and/or text messages.  The Individual Defendants acted as the face of Gallagher to its clients, a role for which Gallagher provided them with substantial compensation.

48.    In 2025, Ackerman's total earnings were $624,933.70, Mackie's total earnings were $101,045.84, and Willings' total earnings were $76,084.60.

## V.  Ackerman Violates her Duty of Loyalty and Likely Steals Trade Secrets.

49.    Gallagher does not know when Ackerman decided to resign and bring Mackie and Willing with her.  However, it does know that Ackerman commenced her efforts to compete with Gallagher even before her resignation.

50.    As one example, Ackerman started using a UDisk thumb drive (SN:6&dc82185; VSN:0E7D77E6) on November 11, 2025. The last time that she used this thumb drive was on December 19, 2025.

51.    Of particular interest for Gallagher is an instance in which she plugged in the thumb drive from 4:18 p.m. to 5:19 p.m on December 2, 2025.  During that period of time, Ackerman interacted with a folder in OneDrive called "Stuff I need" that now does not appear on Gallagher's devices or accounts, as well as "ITASK0010500 - 01 - Part 1.pst," which contains 182 work-related emails from late July 2025.  Those emails are replete with confidential information regarding the Book. Ackerman also interacted with a spreadsheet titled "Jenn company cheat.xlsx," which contains a full list of insurers and contact information and would be useful in moving and servicing business.

52.    Ackerman did not return this thumb drive at the end of her employment. Gallagher will not know the full contents of the thumb drive until it obtains the thumb drive (or an image of it) in discovery but based on her pattern of behavior, it is highly likely that Ackerman retained confidential Gallagher materials on that device.

53.    Ackerman also worked to persuade clients to move their business to HUB before she resigned. For instance, a customer informed Gallagher Sales Executive Kimala Burcar on February 5 that he had been working with Ackerman at HUB for "a

16

couple weeks," which reflected that Ackerman had solicited and moved this client before resigning. Upon information and belief, Ackerman mentioned to other clients that she planned to move to HUB and that they should come with her.

54.     Additionally, while its investigation is ongoing, Gallagher is aware of Ackerman having unsuccessfully recruited at least three of her co-workers to come with her to HUB.  This is on top of the likelihood that Ackerman recruited Mackie and Willing at least 30 days before their resignations to leave Gallagher and come with her.

55.     Specifically, Ackerman solicited Personal Lines Manager Jenn Martin ("**Martin**") to join her at HUB. Ackerman, who was Martin's manager for Martin's first seven years with Gallagher and its predecessor entities, told Martin in mid-December 2025 that Ackerman was planning on leaving Gallagher and that Martin should come with her.  This was not a surprise to Martin because Ackerman had been threatening to leave for years.

56.     Ackerman then provided Martin's personal email address to HUB and likely instructed someone at HUB to solicit Martin because on January 9, 2026, Martin received an email solicitation from HUB stating that they wanted to talk to Martin about a potential move to HUB.

57.     After Martin ignored that email, Ackerman stepped up the recruitment campaign by approaching Martin at a Gallagher office on January 13, 2026 to solicit her to leave Gallagher and join HUB. Ackerman's pitch was that she could get Martin a raise from HUB and that HUB would match her other benefits that she was receiving from

17

Gallagher.  When Martin declined this solicitation, Ackerman told her that she was making a "big mistake."

58.    Ackerman also solicited Erica Marshall and Lisa Wilber, two other Gallagher employees who worked on the Book.  Ackerman did so on or around January 13, 2026 and did so on her behalf as well as the behalf of HUB.

59.    By engaging in this direct recruiting effort while still employed by Gallagher, Ackerman was violating her fiduciary duties.  Additionally, at a minimum, HUB participated in the process or recruiting Martin, which reflects that it was aware that Ackerman was violating those duties and, at a minimum, did not care.

## VI.    The Individual Defendants Resign from Gallagher as Part of Their Unlawful Plan.

60.    On January 27, 2026, the Individual Defendants resigned in unison. Gallagher accepted those notices effective immediately. Based on their actions, Gallagher believes that Ackerman as the leader of the team that included Mackie and Willing solicited them so that they could help her move the Book to HUB and then service it there.

61.    After their resignations, Gallagher discovered evidence that the Individual Defendants had moved to HUB and had begun to solicit numerous customers in violation of Willing and Mackie's Agreements.

62.    Following their resignations, the Individual Defendants' attack on Gallagher's business accelerated, building on the work they did for HUB before resigning. Gallagher has received over 80 BOR letters from clients serviced by the Individual Defendants since January 27, 2026. Upon information and belief, most or all of these

18

customers have moved their business from Gallagher to HUB as a direct result of the

Individual Defendants' violations of the Agreements and/or use of Gallagher's Trade

Secrets.

63.    Further, Gallagher received at least ten of these BOR letters within two

business days of the Individual Defendants' resignations. The only explanation for the

speed at which these customers transitioned their business to HUB is that the Individual

Defendants had already instructed them to do so prior to resigning and/or that the

Individual Defendants retained Gallagher's trade secret information to solicit clients as

fast as possible.

64.    For instance, on January 29, 2026—just two days after her resignation—

Ackerman sent the following correspondence to a Gallagher customer from her HUB

email account:

> Hello Mona
> Vicki and I have transitioned to a new broker this week and reaching out as
> we would like to maintain our policies with you. I just need to send over a
> broker of record form to sign so we can do that. Nothing will change on your
> policies other than the updated brokerage house.
> Assuredpartners was purchased by a larger broker, and it was not a good
> fit for personal service, that we want to continue.
> Please let me know if you have questions or you are agreeable and we will
> send that over. You were one of the first people I am reaching out to since
> we have been together so long.
> Let me know if you want to discuss.
> We need Norma's Safeco auto policy and your policy number as well and
> we can get that digital form over
> Thanks
> Cindy

(Ex. C).

19

65. In this message, Ackerman was using Willing as part of her sales pitch despite the fact that Willing is contractually prevented from servicing this account from the Book.[3] Additionally, Ackerman disparaged Gallagher as being "not a good fit for personal service," which demonstrates her intent to use whatever means she can to persuade clients to move their business to HUB.

66. The customer's response to Ackerman's message makes clear that Ackerman's solicitation was performed in conjunction with Willing, therefore constituting an indirect solicitation in violation of Willing's Agreement:

> Hi Cindy,
> I had received an email from assured about this. I'm fine doing the broker of record change. You can go ahead and send it over to me. I guess I cc'd Vicki but I'm not sure that email would work. I would like to make sure she is aware of all of this since she was my original contact.

(Ex. C).

67. The message that Ackerman was soliciting customers in conjunction with Willing also comes through in a message that she sent on the date of her resignation. In that message, Ackerman said that "we just left you a vm," confirming that she was making calls with Willing. Ackerman repeated the line that Gallagher "was not a good fit for personal service." Gallagher only became aware of this exchange because the client copied Willing's Gallagher email address on her response. When Ackerman realized that

---

[3]  In fact, HUB's counsel's sole response to the demand letters sent by Gallagher was to promise a written reply in the future and to claim that "Vicki Willing is not employed by Hub, although she may be in the future," a disingenuous position given that Ackerman has been copying Willing and referring to her in solicitation pitches.

she had replied to all and that Gallagher would become aware of the exchange, she attempted to recall the message in an effort to cover her tracks. (Ex. D.)

68.    Moreover, Willing was still employed by AP when the aforementioned activity took place. Trying to cover her tracks as Ackerman had, Willing deleted the emails as one of her last acts as a Gallagher employee.

69.    One day later, Willing called another client from the Book in an effort to move her business, as evidenced by the fact that the client emailed Willing at her Gallagher address stating "I can give you a call when we get back or if there's a sense of urgency, please send me an email regarding the changing of the guard."  (Ex. E.)

70.    Mackie was also involved in the movement of the Book. One such example is that she responded to a January 26, 2026 email from Ackerman about a quote with "I can quote it and refer it I guess and then just get the BOR tomorrow?"  This represents Mackie's intent to seek a BOR letter from the client on the following day to move its business to HUB. More generally, Ackerman has been copying Mackie on emails with clients from the Book, further confirming that she intends to have both Willing and Mackie service the clients.

71.    In another instance, on February 5, 2026, a client informed Gallagher that they were ". . . aware that Cindy moved to another agency and ask to transfer our properties insurance agency."  (Ex. F). Upon information and belief, Ackerman retained this client's non-public contact information so that she could solicit him after her resignation.

72.    Numerous other clients who have sent BOR requests to Gallagher have informed Gallagher that they intended to move their business to HUB based on Ackerman's solicitation. Upon information and belief, Willing and Mackie have worked with Ackerman to solicit these clients on behalf of HUB in direct violation of the Agreements, which prohibit such indirect solicitation. Ackerman's role in aiding these breaches of contract, despite her awareness of the Agreements' restrictive covenants, also constitutes tortious interference with contract.

73.    Even more distressingly, the large volume of Gallagher customers who have been solicited by the Individual Defendants makes clear that the Individual Defendants are in possession of Gallagher Trade Secrets and Confidential Information in violation of the Agreements and applicable law. It is impossible that the Individual Defendants have memorized the email addresses and phone numbers for the over 1,800 lines in the Book. Rather, they are in possession of documents reflecting such information. This is made even more apparent by the fact that the Individual Defendants' clients are primarily comprised of individuals and families. In other words, these customers' contact information was not readily available online. It is evident that the Individual Defendants have maintained Gallagher's proprietary information as part of their efforts to unfairly compete with Gallagher.

74.    Upon information and belief, the Individual Defendants have taken this course of action at the instruction of HUB (or at least with its knowledge and consent), who hired the Individual Defendants and have done little or nothing to ensure that Willing and Mackie comply with their restrictive covenants. Rather than lawfully competing with

22

Gallagher, HUB has chosen to cut corners by inducing a high-performing business unit to join HUB and unfairly poach Gallagher's customers so that HUB can profit from the investment Gallagher has made in its employees and clients.

75.     Indeed, HUB should know that the legitimate interests that Gallagher is seeking to protect here are critical because it filed a similar action against two former employees (Leo Portes and Anthony Blanco) in the United States District Court for the Southern District of Florida in which it seeks to enforce similar non-solicitation and non-servicing agreements and to protect client information that is similar to the Trade Secrets at issue in this matter.

76.     As a result of these actions, Gallagher, through counsel, demanded that Defendants cease and desist their improper conduct on January 30, 2026. (Ex. G). To the extent that they were not aware already, HUB and Ackerman had notice of the Agreements no later than this date.

77.     Despite this knowledge, HUB and Ackerman have continued to knowingly and intentionally interfere with Gallagher's contractual rights in a manner that is harmful to Gallagher for HUB's own benefit.

78.     In summary, Gallagher has determined that the Individual Defendants have violated their duties of loyalty to Gallagher by transitioning clients from the Book to HUB before their resignations and that Willing and Mackie have breached the Agreements by directly and indirectly soliciting customers with whom they worked at Gallagher on behalf of HUB.  They collaborated with Ackerman to accomplish these goals, and Ackerman assisted them with their breaches of contract. Finally, Defendants have misappropriated

23

Gallagher Trade Secrets and Confidential Information in order to use the contact information for numerous clients for unlawful solicitations.

79.    Gallagher has been irreparably damaged in numerous ways.  First, it lost client relationships based on the fact that it had a trio of disloyal employees diverting business away from it.  Gallagher's relationships with clients have been damaged by the Individual Defendants acting in unauthorized ways.

80.    Additionally, Gallagher has been irreparably damaged by the Individual Defendants' improper disclosure and use of Gallagher Trade Secrets and Confidential Information on behalf of HUB.

81.    Finally, Gallagher is only aware of the tip of the iceberg with respect to Defendants' competitive acts.  Gallagher has only learned of Defendants' activities through BOR letters and email communications erroneously sent to the Individual Defendants' Gallagher email accounts. It expects that further investigation and discovery will reveal substantially more evidence of unlawful conduct.

## COUNT ONE
### BREACH OF FIDUCIARY DUTY
### (AGAINST ACKERMAN)

82.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

83.    By virtue of Ackerman's status as Vice President, she operated as a fiduciary with respect to Gallagher's business and owed Gallagher a fiduciary duty to exercise the utmost good faith and loyalty in the performance of her duties and to act solely for the benefit of Gallagher with respect to all matters related to her employment.

24

84.    The above-described conduct constitutes a breach of Ackerman's fiduciary duty to Gallagher.  Ackerman breached her fiduciary duty to Gallagher by, among other things, engaging in misconduct that served her own self-interest and the interests of commercial adversaries (such as HUB) rather than the interests of Gallagher and acted in a manner inconsistent with the best interests of Gallagher by diverting the business of Gallagher clients to HUB prior to her resignation.

85.    Additionally, Ackerman recruited at least three co-workers (and likely more) to resign from Gallagher and join HUB, which also violated her fiduciary duty.

86.    As a direct and proximate result of Ackerman's breach of her fiduciary duties, Gallagher has incurred damages.  Gallagher is also entitled to recovery of all compensation paid to Ackerman during her period of disloyalty.

87.    The actions of Ackerman, as alleged in Count One, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

## COUNT TWO
### BREACH OF DUTY OF LOYALTY
### (AGAINST ACKERMAN)

88.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

89.    By virtue of Ackerman's status as Vice President, Ackerman operated as a fiduciary with respect to Gallagher's business and owed Gallagher a fiduciary duty to exercise the utmost good faith and loyalty in the performance of her duties and to act solely for the benefit of Gallagher with respect to all matters related to her employment.

90.     The above-described conduct constitutes a breach of Ackerman's duty of loyalty to Gallagher.  Ackerman breached her duty of loyalty to Gallagher by, among other things, engaging in misconduct that served her own self-interest and the interests of commercial adversaries (such as HUB) rather than the interests of Gallagher and acted in a manner inconsistent with the best interests of Gallagher by diverting the business of Gallagher clients to HUB prior to her resignation.

91.     Additionally, Ackerman recruited at least three co-workers (and likely more) to resign from Gallagher and join HUB, which also violated her duty of loyalty.

92.     As a direct and proximate result of Ackerman's breaches of her duty of loyalty, Gallagher has incurred damages.  Gallagher is also entitled to recovery of all compensation paid to Ackerman during her period of disloyalty.

93.     The actions of Ackerman, as alleged in Count Two, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

## COUNT THREE
### BREACH OF CONTRACT
### (AGAINST WILLING AND MACKIE)

94.     AP incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

95.     As a condition of the commencement of their employment with AP (now Gallagher), Willing and Mackie executed the Agreements.

96.     The Agreements are valid and enforceable contracts that prohibit Willing and Mackie from (among other things): (a) using, disclosing, or retaining any of

Gallagher's Confidential Information except for the benefit of Gallagher; or (b) soliciting or servicing certain Gallagher clients (whether directly or indirectly).

97.    Gallagher has met all of its obligations to Willing and Mackie under the Agreements.

98.    The above-described conduct constitutes a breach of Willing's and Mackie's contractual obligations to Gallagher.  Willing and Mackie breached the Agreements by, among other things, soliciting and servicing Gallagher's clients on behalf of HUB, a direct competitor, as well as by using and/or disclosing Gallagher's confidential information for acts in competition with Gallagher.

99.    As a direct and proximate result of Willing's and Mackie's actions in breach of the Agreements, Gallagher has sustained and will continue to sustain damages.

100.    Gallagher is faced with irreparable injury as a result of Willing's and Mackie's actions, as they threaten Gallagher with damages for which it cannot be made completely whole.

101.    Pursuant to the terms of the Agreements, Gallagher is entitled to recover its attorneys' fees incurred in this action.

<u>**COUNT FOUR**</u>
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(AGAINST ACKERMAN AND HUB)**

102.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

27

103.    As a condition of the commencement of their employment with AP (now Gallagher) and in exchange for substantial compensation, Willing and Mackie executed the Agreements.

104.    The Agreements are valid and enforceable contracts that prohibit Willing and Mackie from (among other things) (a) using, disclosing, or retaining any of Gallagher's Confidential Information except for the benefit of Gallagher; or (b) soliciting or servicing certain Gallagher clients (whether directly or indirectly).

105.    Ackerman has been aware of the existence of the Agreements between Gallagher on the one hand and Willing and Mackie on the other because she worked closely with Willing and Mackie at Gallager and received notice of Willing and Mackie's obligations under the Agreements.

106.    Upon information and belief, HUB has been aware of the existence of the Agreements between Gallagher on the one hand and Willing and Mackie on the other. At the latest, HUB gained knowledge of the Agreements on January 30, 2026, when it received correspondence from Gallagher's counsel detailing Willing and Mackie's obligations under the Agreements.

107.    The above-described conduct constitutes tortious interference with Willing's and Mackie's contractual obligations to Gallagher.  By concocting and participating in a scheme with Willing and Mackie to move clients over to HUB (and by compensating them for doing so), HUB intentionally interfered with the Agreements between Willing and Mackie on the one hand and Gallagher on the other, and it induced them to breach the Agreements.

108.    By participating in a scheme with Willing and Mackie to move clients over to HUB, and by directly soliciting clients covered by the Agreements at the direction of, and in collaboration with, Willing and Mackie, Ackerman intentionally interfered with the Agreements between Willing and Mackie on the one hand and Gallagher on the other, and she induced them to breach the Agreements.

109.    HUB and Ackerman have no justification for their intentional interference with the Agreements.

110.    As a direct and proximate result of the actions of HUB and Ackerman, Gallagher has sustained and/or will suffer damages.

111.    The conduct of Ackerman and HUB was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Gallagher, entitling Gallagher to an award of punitive damages.

## COUNT FIVE
### DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *ET SEQ.*)
### (AGAINST THE INDIVIDUAL DEFENDANTS)

112.    AP incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

113.    The customer information the Individual Defendants have stolen from Gallagher for use at HUB  – such as the likely contents of the thumb drive that Ackerman was using in November/December 2025 and that she did not return at the end of her employment – are trade secrets of Gallagher subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*

29

114.    The materials taken by the Individual Defendants are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.  Gallagher has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

115.    The customer information at issue is related to products or services used in, or intended for use in, interstate commerce.

116.    Gallagher takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

117.    The Individual Defendants obtained and likely used the information contained in these files and data by improper means in violation of their contractual and other obligations to Gallagher. Indeed, the Individual Defendants have demonstrated that they are using such information by contacting in rapid fashion numerous Gallagher customers, whose contact information would not be available to the Individual Defendants in absence of such misappropriation.

118.    The Individual Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duties the Individual Defendants owed and continue to owe Gallagher as agents, employees, and representatives of Gallagher.

119.    The Individual Defendants' foregoing conduct constitutes actual and threatened misappropriation and misuse of Gallagher's trade secret information in violation of the DTSA.

120.    As a direct and proximate result of the Individual Defendants' misappropriation, Gallagher has suffered and/or will suffer damages and irreparable harm, and is entitled to injunctive relief, damages, attorneys' fees, costs, and remedies permitted under the DTSA.

121.    Each of the acts of misappropriation, as alleged in Count Five, was done willfully and maliciously by the Individual Defendants, thereby entitling AP to exemplary damages to be proved at trial and recovery of its attorneys' fees.

### COUNT SIX
**COLORADO UNIFORM TRADE SECRETS ACT (COLO. REV. STAT. ANN. § 7-74-101 *ET SEQ.*)**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

122.    AP incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

123.    The customer information the Individual Defendants have stolen from Gallagher for use at HUB – such as the likely contents of the thumb drive that Ackerman was using in November/December 2025 and that she did not return at the end of her employment – are trade secrets of Gallagher subject to protection pursuant to Colo. Rev.

31

Stat. Ann. § 7-74-101 *et seq.* because Gallagher derives independent economic value from such information being secret and not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

124.  Gallagher took reasonable precautions under the circumstances to protect its Trade Secrets, and all parties with access to its Trade Secrets (including the Individual Defendants) were subject to obligations to maintain their secrecy.

125.  The Individual Defendants, as employees of Gallagher, had access to information that consisted of Gallagher's Trade Secrets.

126.  The Individual Defendants willfully and maliciously misappropriated Gallagher's Trade Secrets by, among other acts, stealing and likely using Gallagher's Trade Secrets without authorization (express or implied) at a time that they knew or had reason to know that they had a duty to Gallagher to maintain the secrecy and confidentiality of the Trade Secrets that they used to compete with Gallagher.  They stole the materials at a time when they had been instructed not to do so and when they were furtively competing directly with Gallagher.

127.  As a direct and proximate result of the Individual Defendants' misappropriation, Gallagher has suffered and/or will suffer damages and irreparable harm, and is entitled to injunctive relief, damages, attorneys' fees, costs and remedies permitted under the Colorado Uniform Trade Secrets Act.

128.    Each of the acts of misappropriation, as alleged in Count Six, was done maliciously by the Individual Defendants, thereby entitling Gallagher to exemplary damages to be proved at trial and recovery of its attorneys' fees.

## COUNT SEVEN
### UNJUST ENRICHMENT
**(All Defendants)**

129.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

130.    As a result of their misconduct as alleged in this Complaint, Defendants have been unjustly enriched by converting Gallagher's clients to their own purposes and benefits at Gallagher's expense.[4]

131.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

## COUNT EIGHT
### CIVIL CONSPIRACY
**(All Defendants)**

132.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

133.    Defendants each agreed with one another that they would divert Gallagher's clients for their own profit and that they would collaborate in doing so in violation of Defendants' contractual, statutory and common law obligations.

---

[4]    Gallagher pleads this claim in the alternative as to Mackie and Willing to the extent that Gallagher does not receive complete relief against them under the Agreements

134.    Defendants were aware that the confidential, proprietary and trade secret information of Gallagher to be extremely valuable in moving Gallagher business while causing harm to Gallagher.

135.    To that end, Defendants had a meeting of the minds with the object of accomplishing the unlawful conduct stated in this Complaint.

136.    Defendants performed one or more unlawful, overt acts in furtherance of accomplishing their objective, as set forth herein.

137.    Gallagher has suffered damages as a result of this conspiracy.

138.    By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Gallagher thereby, each defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each defendant/co-conspirator.

139.    The actions of Defendants, as alleged in Count Eight, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Arthur J. Gallagher & Co. and AssuredPartners of Colorado, LLC request that this Court provide them with injunctive relief and money damages against Defendants in the following forms:

a.    Entry of injunctive relief against Defendants requiring that Mackie and Willing comply with their post-employment contractual restrictions and that Ackerman and HUB do not take any steps to induce or participate in further breaches of those restrictions;

b.      Entry of injunctive relief against Defendants requiring that they return to Gallagher all materials containing Gallagher Trade Secrets retained by the Individual Defendants at the end of their employment and that they refrain from any further use or disclosure of Gallagher Trade Secrets retained by the Individual Defendants at the end of their employment (including any intellectual property derived from Gallagher Trade Secrets);

c.      An award of actual and compensatory damages in an amount to be proven at trial;

d.      An award of damages for unjust enrichment in an amount to be proven at trial;

e.      In lieu of damages measured by other methods, an award of reasonable royalties for the Defendants' unauthorized use or disclosure of Gallagher's confidential information and Trade Secrets;

f.      An award of disgorgement of compensation paid to Individual Defendants during any period in which they violated their fiduciary duties to Gallagher;

g.      An award of exemplary and punitive damages to be proven at trial;

h.      Pre-judgment and post-judgment interest;

i.      An award of reasonable attorneys' fees and costs incurred in this action; and

j.      Such other relief as is just and proper.

Respectfully submitted,


**FISHER & PHILLIPS LLP**

*/s/ Michael R. Greco*
Michael R. Greco
mgreco@fisherphillips.com
1125 17th Street, Suite 2400
Denver, Colorado 80202
(303) 218-3655 Telephone
(303) 218-3651 Facsimile

Michael P. Elkon, GA Bar No. 243355
melkon@fisherphillips.com
Matthew T. Sharon, GA Bar No. 723611
msharon@fisherphillips.com
1230 Peachtree Street, NE, Suite 3300
Atlanta, Georgia 30309
(404) 231-1400 Telephone
(404) 240-4249 Facsimile

ATTORNEYS FOR PLAINTIFFS

36