**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

**ARTHUR J. GALLAGHER & CO., and
ASSUREDPARTNERS OF COLORADO, LLC**

        **Plaintiff,**

        **v.**                           **Case No. 1:26-cv-00539-RMR-SBP**

**CINDY ACKERMAN JOHNSON,
VICKI WILLING,
AMANDA MACKIE, and
HUB INTERNATIONAL LIMITED**

        **Defendants.**

---

### AMENDED COMPLAINT

---

Plaintiffs Arthur J. Gallagher & Co. and AssuredPartners of Colorado, LLC ("**AP**") (collectively, "**Plaintiff**" or "**Gallagher**"), by and through its undersigned counsel, hereby brings this Amended Complaint for injunctive relief and money damages against Defendants Cindy Ackerman Johnson ("**Ackerman**"), Vicki Willing ("**Willing**"), Amanda Mackie ("**Mackie**"), and HUB International Limited ("**HUB**") (collectively, "**Defendants**") (Ackerman, Willing, and Mackie collectively, "**Individual Defendants**") for violations of the Restrictive Covenants Agreements (the "**Agreements**," attached hereto as Exhibits A and B and incorporated herein by reference) between Gallagher on the one hand and Willing and Mackie on the other, as well as trade secret misappropriation, breach of the fiduciary duty of loyalty, deceptive trade practices, tortious interference with Gallagher's contractual rights, and other claims. In support thereof, Gallagher avers as follows:

## <u>INTRODUCTION</u>

1.      Gallagher is in the business of providing insurance business solutions through trusted brokers. The deal that it makes with those brokers is that it will compensate them handsomely in return for the brokers providing loyal service during their employment and then not engaging in unfair competition after the end of the relationship.

2.      Gallagher upheld its end of this bargain with Ackerman, paying her over $600,000 in 2025 and giving her an entire team of professionals to manage a large book of personal insurance business containing over 1,800 lines and generating over $2.3 million in annual revenue (the "**Book**").  Ackerman has repaid this trust by breaching her obligations in every possible way. While still working for Gallagher, she aggressively recruited numerous co-workers to leave and join her at HUB, a direct competitor. Two of those co-workers – Mackie and Willing – joined her.

3.      Having assembled her team, Ackerman then led an effort to steal the Book on behalf of HUB, an effort that started while they were still Gallagher employees and continues to this day. Upon information and belief, the Individual Defendants reached out to one or more clients during their Gallagher employment to inform them of their upcoming move to HUB and to persuade them to move their business.  The Individual Defendants engaged in this surprise attack to get a head start on moving the Book to HUB, all for Defendants' collective benefit.

4.      The Individual Defendants resigned en masse on January 27, 2026. Ackerman then immediately commenced a full court press to move the Book by reaching out to Gallagher's clients in an effort to persuade them to move to HUB.  Ackerman states

that she "worked 12 hours days or more for the next two weeks" to persuade the clients in the Book to transition their brokerage business to HUB.  Given the large number of clients at issue, it is virtually certain that Ackerman did so using trade secret information stolen from Gallagher as there is no way that she would have the contact and policy information for this vast assemblage of Gallagher's clients without having stolen a comprehensive client list.

5.      One means by which Ackerman stole Gallagher's trade secrets was through the use of a flash drive, which she started using on November 11, 2025, one day after she "expressed [her] concerns about [her] path forward at Gallagher" to senior Gallagher management.  On that same day, Ackerman requested from two co-workers a list of all of the clients in the Book, claiming that she needed them to send Christmas gifts to clients.

6.      Ackerman took the two spreadsheets that she received from her co-workers – "Cindy book 11 2025 .xlsx" and "Denver CO BOB Personal Lines 11 .11.25 .xlsx" – and put them on a flash drive.[1]  The last time she accessed them on that flash drive was January 19, 2026, well after she would have needed it for sending Christmas gifts.  Moreover, she accessed the flash drive on a personal computer. Ackerman had no legitimate business reason to put the files on a personal flash drive or access them on a personal computer because she could have accessed all of this information on Gallagher's computer system if she were accessing it for a proper work purpose.

---

[1]      The flash drive likely contains additional Gallagher Trade Secrets, including the "January 2025 Cindy Ackerman" spreadsheet referenced below.  Gallagher has not been able to determine the full extent of Ackerman's acts of misappropriation because she has refused to return the flash drive or provide a forensic copy of it.

7.      The documents that Ackerman retained after the end of her employment are replete with trade secret information (namely client contact and policy information) that would be critical to steal business, which is exactly what Ackerman proceeded to do.

8.      Ackerman has rejected repeated requests to return the flash drive. Ackerman has also rejected Gallagher's request for a forensic inspection of the flash drive, which would enable Gallagher to understand in greater detail what files she retained and whether she deleted files from the flash drive.

9.      Ackerman has also been dishonest in numerous respects regarding the flash drive.  Her story is that she could not have possibly misappropriated the trade secret information she removed from Gallagher's systems and onto her flash drive because she turned the flash drive over to her lawyer (i.e., her husband) the day she resigned. This cover story is a red herring, undercut by her own forensic expert's declaration.  Ackerman testified under oath that her recollection is that she last accessed the flash drive in early January 2026 for personal reasons.  In reality, she last accessed it on January 19, 2026 (mere days before her resignation) – on a non-Gallagher device – and the two files that she accessed during that use were trade secret client lists, not personal documents.

10.     There is no telling what Ackerman did when accessing those documents in her final preparations for her move to HUB. Print them? Save them as a new document on her personal computers? Email them to a personal account? Copy and paste the contents into a new document? Take handwritten notes from them? Move the contact information into her smartphone? The possibilities are endless.  Just because she purportedly gave the flash drive she knew she should not have to her lawyer the day she

4

resigned does not mean she didn't already misappropriate the Gallagher information she needed to solicit the Book as rapidly and effectively as possible. Her own forensic expert's declaration supports Gallagher's misappropriation claims and her outright refusal to return the flash drive (or provide an image of it) does not help her claims to the contrary.

11.     Separate from her trade secret usage, Ackerman also used Mackie and Willing as part of her raid. Both Mackie and Willing are subject to the Agreements, which prohibit them for a certain period of time from soliciting, servicing, or accepting business from the clients in the Book. The Individual Defendants have engaged in a collective effort to solicit those clients, selling themselves as a cohesive team and all in violation of the Agreements. The Broker of Record letters ("**BOR**") that Gallagher started receiving for clients in the Book reflect that Mackie and/or Willing were involved in the efforts to move the business or at least that Ackerman is involving them in the pitches so as to sell the clients on the notion that they will get continuity of service.[2] Indeed, numerous former Gallagher clients have confirmed that they anticipate Willing to continue to service their business at HUB.

12.     Ackerman's campaign against Gallagher has not been limited to stealing its trade secrets and poaching its employees, though. Since departing Gallagher, Ackerman has made numerous false claims about Gallagher in an attempt to smear Gallagher and convince its clients to leave with Ackerman for HUB. Among other false statements,

---

[2]     A BOR letter is a formal document, typically on company letterhead, that authorizes an insurance carrier to replace an existing agent/broker with a new one to manage specific insurance policies. In practice, the receipt of this letter informs a broker like Gallagher that a client is moving its business to a different broker.

Ackerman has told Gallagher clients she is trying to poach that if they stay with Gallagher, their accounts will be serviced by a foreign call center. That is false, as are her statements that the clients would be serviced at HUB by the same team that serviced them at Gallagher.

13.      Taken together, Defendants' behavior has been illegal in numerous respects. The Individual Defendants flagrantly violated their duties of loyalty to Gallagher by soliciting clients and co-workers before resigning. Likewise, Ackerman has misappropriated Gallagher trade secrets and made numerous false or misleading statements as a part of her frantic efforts to move the Book. Finally, Mackie and Willing have violated their contractual promises and Ackerman has participated in those violations at every step of the way.

14.      HUB shares the blame for these repeated acts of unfair competition. Gallagher has made it aware of the actions of its new employees and it has done absolutely nothing to ensure that they comply with their basic obligations. HUB knows that the information that Ackerman used and is continuing to use to solicit the Book is entitled to trade secret protection as HUB has taken that position in at least two lawsuits. HUB's belated instructions to Individual Defendants (which came only *after* this lawsuit was filed and not in the weeks preceding it when Gallagher had put HUB on notice of the misconduct) are insufficient as evidenced by the fact that the Individual Defendants' misconduct is continuing to this day. HUB would rather profit from the movement of the Book than meaningfully ensure that a competitor's rights in its trade secrets and client relationships are respected.

6

15.     Gallagher is seeking injunctive relief to ensure that Mackie and Willing comply with their contractual requirements and that Defendants do not continue to misappropriate its trade secrets.  Gallagher requires injunctive relief because the damage that Defendants are doing and will continue to do absent court involvement are irreparable. Gallagher cannot put a complete price tag on its trade secret information or on the value of the relationships that Defendants are stealing, which is why the trade secret statutes and the Agreements all provide for injunctive relief in exactly this situation.

16.     Gallagher is also seeking to be made whole for its losses, namely through compensation for its lost revenues and Defendants' unjust enrichment, as well as recovery of its attorneys' fees and other forms of monetary relief.

17.     Gallagher is not seeking to prevent the Individual Defendants from working for HUB.  It endorses free and fair competition.  What it cannot tolerate is a collection of employees who violate their fiduciary duties, breach their Agreements, and use trade secrets in order to take the Book.

## PARTIES AND JURISDICTION

18.     Plaintiff Arthur J. Gallagher & Co. is an entity organized under the laws of the State of Delaware with its principal place of business in Rolling Meadows, Illinois, and includes its subsidiaries, divisions, affiliates, and related companies (including AssuredPartners). AJG is a global insurance brokerage and risk management firm offering, among other things, property and casualty insurance services, bond and surety placements, and employee benefits insurance consulting to companies across many industries.

7

19.     Plaintiff AssuredPartners of Colorado, LLC is a Colorado limited liability company, and its sole member and owner is AssuredPartners Capital, Inc., a Delaware corporation with its principal place of business in Orlando, Florida. AJG acquired AssuredPartners in August 2025 when it acquired AssuredPartners' parent company in a stock purchase agreement. As part of the stock purchase agreement, AJG assumed the right to enforce employment agreements between AssuredPartners and retained employees, including Individual Defendants. AssuredPartners continues to operate as an AJG subsidiary and also has the right to enforce agreements with employees.

20.     Willing is an individual who, upon information and belief, is a resident of Colorado, living at 22456 East Plymouth Circle, Aurora, Colorado 80016.

21.     Mackie is an individual who, upon information and belief, is a resident of Texas, living at 5729 Copper Vista, New Braunfels, Texas 78132.

22.     Ackerman is an individual who, upon information and belief, is a resident of Colorado, living at 3516 Akron Street, Denver, Colorado 80238.

23.     HUB is a Delaware corporation with its principal place of business located at 150 N. Riverside Plaza 17th Floor, Chicago, Illinois 60606.  HUB describes itself as a "leading North American insurance brokerage that provides employee benefits, business, and personal insurance products and services."  As such, it is a direct competitor of Gallagher.

24.     This Court has personal jurisdiction over the Individual Defendants because they are residents of Colorado and/or because the Individual Defendants have engaged

8

in unlawful conduct in Colorado and in this judicial district, which has caused harm and will continue to cause damages to Gallagher in Colorado.

25.    This Court has personal jurisdiction over HUB because it regularly conducts business in Colorado and thus has continuous, systematic, and substantial contacts with Colorado, including having hired the Individual Defendants to work for HUB in Colorado. HUB also committed unlawful acts directed at Gallagher in Colorado that have caused and will continue to cause damages to Gallagher in Colorado.

26.    This court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Gallagher is asserting a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836.  The Court also has supplemental or pendent jurisdiction over Gallagher's remaining claims under 29 U.S.C. § 1367 because they form part of the same case or controversy as the federal question claim.

27.    Venue is proper in this Court because Defendants regularly conduct substantial business activities in Colorado and because Gallagher's causes of action arise, in whole or in part, in Colorado.

**<u>GENERAL ALLEGATIONS COMMON TO ALL COUNTS</u>**

I.    **<u>Background and Business of Gallagher</u>**

28.    Founded in 1927, Gallagher is a leading insurance brokerage firm – that is, it facilitates the sale of insurance policies between insureds (those buying the insurance) and insurance carriers (those selling insurance).

29.    As an insurance brokerage, Gallagher relies upon and invests heavily in the success of its individual insurance producers. These producers leverage their experience,

expertise, and Gallagher's national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients.  Repeat business through insurance renewals from existing clients is of paramount importance to the success and growth of Gallagher. Gallagher invests in its producers to ensure they continue to nurture and develop the Gallagher book of business assigned to and/or generated by an individual producer.

## II.    Gallagher's Trade Secrets

30.    Equally critical to Gallagher's success, however, is its investment into the development and safeguarding of the confidential and trade secret information central to the business platform. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, Gallagher protects its prized assets – the trade secret and confidential information acquired and developed through continued investment.

31.    Gallagher devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Gallagher. The compilation and combination of this information is secret and provides Gallagher with a competitive advantage.  As alleged herein, Gallagher treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**Gallagher Trade Secrets**"), including:

a.    Certain non-public information concerning Gallagher clients, prospective clients, client and prospective client points of contact and contact information,

10

acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements;

b.      Gallagher's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods;

c.      the specific services and products offered by Gallagher to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks; and

d.      Personal identifying information, job history, qualifications, training, specialties, strengths, weaknesses, evaluations, client contacts, contractual obligations, pay data, salary and commission information, job responsibilities, account responsibilities, client satisfaction, employee turnover or retention, or other business-related information of Gallagher employees.

32.    The "January 2025 Cindy Ackerman," "Cindy book 11 2025 .xlsx," and "Denver CO BOB Personal Lines 11 .11.25 .xlsx" spreadsheets (collectively the "**Flash Drive Spreadsheets**") are all examples of the Gallagher Trade Secrets.  They all contain detailed non-public information regarding the clients, namely their contact information and details regarding their insurance policies.

33.    Gallagher developed, compiled, and acquired its Trade Secrets at great expense and through substantial efforts. Gallagher's Trade Secrets are not readily

ascertainable in the insurance industry or in any type of trade or public directory or any other source.

34.     The misuse of Gallagher's Trade Secrets, whether through the improper disclosure or improper use for a non-Gallagher business purpose, would cause significant damage to Gallagher through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

35.     As such, Gallagher takes careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of Gallagher Trade Secrets.  Gallagher has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as:

a. emphasizing to employees Gallagher's need to keep this information a secret;

b. requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Gallagher;

c. having employees execute confidentiality and non-disclosure agreements that instruct Gallagher's employees not to disclose, reproduce or use this information without Gallager's consent;

d. distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements;

e. limiting access and/or restricting access to this information by employees on a need-to-know basis;

f. requiring unique usernames and passwords to access Trade Secrets on Gallagher's computer systems and databases; and

g. implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Gallagher's computer system, servers, and networks, encrypting Gallagher's laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

36. Gallagher also guards the confidentiality of its Trade Secrets by enforcing its contracts protecting its Trade Secrets. Gallagher does not tolerate violations of confidentiality provisions and takes steps to enforce its rights, from cease-and-desist letters to litigation seeking emergency or preliminary and permanent injunctive relief, when, for example, producers violate their employment and post-employment confidentiality obligations.

37. Gallagher has routinely enforced the terms of its employment agreements in recent years to protect against the use and disclosure of its Trade Secrets. By way of example, in the last five years, various AssuredPartners companies have obtained injunctive relief enforcing their agreements in federal court in Kansas, Kentucky, and Nevada, as well as Chancery Court in Delaware. This is a non-exhaustive list.

38.    Moreover, HUB considers its versions of the Gallagher Trade Secrets to be protectable by injunctive relief as evidenced by positions that it has taken in litigation in California in 2021 and Florida in 2026 that client and policy information similar to that at issue in this matter are trade secrets.

39.    Because of the nature of the Trade Secrets, Gallagher's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being secret, and the fact that the Trade Secrets cannot be readily ascertained from public sources by competitors, Gallagher's Trade Secrets are trade secrets under federal and state law.

40.    In the course and scope of Ackerman's duties as Senior Vice President, as well as in the course and scope of Willing and Mackie's duties as Private Client Account Executives, the Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Gallagher Trade Secrets from use and disclosure for a competitive purpose.

41.    The Individual Defendants predominantly worked with individuals and families on personal lines of insurance. As such, they worked with a large volume of clients whose contact and policy information is generally not publicly available – certainly not as a compilation – and therefore the clients lists that they used to do their jobs are especially important Trade Secrets.

14

### III.    Willing, Mackie, and the Agreements

42.    Willing was hired by AP on July 1, 2014. Mackie was hired by AP on July 8, 2024.[3] As a condition of the commencement or continuation of their employment with AP, Willing and Mackie were required to sign the Agreements.

43.    Willing executed her Agreement on May 11, 2021 when she was a resident of Colorado.

44.    Section 2 of both Agreements contain identical definitions of Confidential Information:

> (a)    For purposes of this Agreement, the term "Confidential Information" means all Trade Secrets and other information that is proprietary, private, and not generally known or accessible to members of the public or competitors of Company or Employer Group, whether or not in a written or recorded form, concerning the business or affairs of Company and/or its affiliates, subsidiaries, and parent companies and each of their respective successors and assigns (both individually and collectively as the context may require, the "Employer Group"), including but not limited to, information relating to:
>
> (i)    Employer Group's clients, prospective clients, acquisition targets, vendors, retail insurance brokers or agents, insurance carriers, insurance underwriters, and insurance wholesalers; or
>
> (ii)    Employer Group's financial condition, business costs, profits and losses, results of operations, marketing plans, business plans, operations, acquisition strategies, pricing, commissions, promotions, and business strategies and methods; or
>
> (iii)    services and products offered by Employer Group to its clients or prospective clients, including but not limited to, policy forms and information, policy types, rating information, premium amounts, expiration dates, renewal information, client preferences or needs, client and prospective client lists (including lists that contain specific, customized information about clients such as the identity or preferences of decision-makers, specialized requirements, habits, risk profiles, programs, purchase history and patterns, and overall insurance needs or preferences), information on risk characteristics, information concerning insurance markets for large or unusual risks and/or contracts or arrangements (including special terms and deals).

(Ex. A, § 2(a)(i-iii); Ex. B, § 2(a)(i-iii)).

45.    In the Agreements, Willing and Mackie committed that they would not take, copy, duplicate, use, or disclose AP's Confidential Information to any third party.  (Ex. A,

---

[3]    At the time of her hire, Mackie lived and worked in Arizona. Gallagher understands that Mackie moved to Texas in June 2025, and was a Texas resident during the period of time in which she worked for HUB.

§ 2(b); Ex. B, § 2(c)). Mackie's Agreement provides that the duration of her non-disclosure obligation with respect to Confidential Information that is not a Gallagher Trade Secret is 18 months after the end of her employment with Gallagher. (Ex. B, § 2(c)).

46.     The Agreements also prohibit Willing and Mackie from soliciting, servicing, or accepting business from certain AP clients or prospects (as defined in Exs. A and B, § 3(b)-(d)) during and for a limited period after their employment:

> 3.     *Non-Solicitation & Non-Interference.*
>
> (a)     Except on behalf of Company, during Employee's employment with Company and for twenty-four (24) months after Employee's employment with Company ends (whether voluntarily or involuntarily) (the "Restricted Period"), Employee shall not directly or indirectly through another person or entity:
>
> (i)     offer, sell, solicit, quote, place, provide, or renew, any Insurance Products or Related
>
> Services to any Restricted Client or Active Prospective Client; or
>
> (ii)     service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client; or
>
> (iii)     request, accept, facilitate, authorize, execute, send, process, or submit a broker of record or agent of record letter on behalf of any Restricted Client or Active Prospective Client, which would change the broker or agent of record for any Restricted Client or Active Prospective Client from Company to any other third party; or
>
> (iv)     take any action intended, or reasonably likely, to cause any Restricted Client or Active Prospective Client, to diminish its business with, or cease or refrain from doing business with, any member of Employer Group; or

(Ex. A, § 3(a)).

16

3.    *Non-Solicitation & Non-Interference.*

(a)    Except on behalf of Company, during Employee's employment with Company and for the Restricted Period, Employee shall not directly or indirectly through another person or entity:

(i)    solicit, sell, provide or renew any Insurance Products or Related Services to any Restricted Client or Active Prospective Client; or

(ii)    service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client; or

(Ex. B, § 3(a)).

47.    Mackie's Agreement defines "Restricted Period" as 18 months after her employment with AP ends, whether voluntarily or involuntarily. (Ex. B, § 2(c)).  Willing's Agreement defines "Restricted Period" as 24 months after her employment with AP ends, whether voluntarily or involuntarily. (Ex. A, § 3(a)).

48.    Mackie's Agreement also explicitly provides that "indirectly" means to knowingly and purposefully accomplish through others what Employee cannot accomplish directly without violating a covenant in her Agreement (Ex. B, § 3). Mackie further promised that she would not engage in any subterfuge to circumvent her non-solicitation obligations and that she could not contact clients covered by her restrictive covenants with or through other persons or entities. (*Id.*).

49.    Willing and Mackie additionally agreed that AP would be entitled to injunctive relief were they to violate the provisions of the Agreements. (Ex. A, § 6; Ex. B, § 7).

50.    Finally, Willing and Mackie agreed that if they breached the contract, then AP would be entitled to recover its attorneys' fees.  (Ex. A, § 20, Ex. B, § 19).

17

51.     AP's rights under the Agreements inured to Gallagher following Gallagher's acquisition of AP.

### IV.    The Individual Defendants' Duties with AP.

52.     At the time of her resignation, Ackerman was employed by Gallagher as a Senior Vice President, Personal Lines.

53.     In her Vice President role, Ackerman was responsible for developing new business, maintaining existing relationships, supervising employees, and generally helping to manage Gallagher's operations in Colorado,

54.     Ackerman's duties for AP included

    a.  the use of sales techniques to identify prospects;

    b.  engaging in frequent communications with Gallagher clients to build relationships and address those clients' insurance needs;

    c.  working on renewal and marketing strategies; and

    d.  developing relationships with carriers by becoming familiar with and executing strategies developed for satisfying carrier goals and objectives, as well as participating in carrier sponsored activities.

55.     Ackerman worked closely with Willing and Mackie to service Gallagher's clients.  The close coordination of these team members was essential for the proper servicing of clients, as it takes multiple co-workers with specific knowledge on the special insurance needs of clients in order to address the needs of those clients.

56.     In their positions as Private Client Account Executives, Willing and Mackie were also exposed to a large number of Gallagher's clients. Willing and Mackie were

18

responsible for assisting Ackerman with soliciting potential clients and servicing Gallagher's current clients.  Willing and Mackie routinely worked with Gallagher's Trade Secrets in order to take care of the clients in the Book such that the Agreements are necessary to protect those Trade Secrets from being used in unfair competition against Gallagher's interests.

57.    Collectively, the Individual Defendants worked to take care of the insurance needs of Gallagher's clients in the Book. This entailed constant contact by phone, email, and/or text messages.  The Individual Defendants acted as the face of Gallagher to its clients, a role for which Gallagher provided them with substantial compensation.

58.    In 2025, Ackerman's total earnings were $624,933.70, Mackie's total earnings were $101,045.84, and Willings' total earnings were $76,084.60.

## V.    **Ackerman Violates her Duty of Loyalty and Steals Trade Secrets.**

59.    Gallagher does not know exactly when Ackerman decided to resign and bring Mackie and Willing with her.  However, it does know that Ackerman commenced her efforts to compete with Gallagher weeks before her resignation.

60.    As one example, Ackerman started using a UDisk flash drive (SN:6&dc82185; VSN:0E7D77E6) on November 11, 2025.  This was one day after she "expressed [her] concerns about [her] path forward at Gallagher" to senior Gallagher management.  She used it several times in the following weeks, all during a period in which she (falsely) claims to have been verbally abused by an AssuredPartners executive and then tried to avoid coming into the office.

19

61.    Ackerman plugged in the flash drive from 4:18 p.m. to 5:19 p.m on December 2, 2025.  During that period of time, Ackerman interacted with a folder in OneDrive called "Stuff I need" that now does not appear on Gallagher's devices or accounts, as well as "ITASK0010500 - 01 - Part 1.pst," which contains 182 work-related emails from late July 2025.  Those emails are replete with confidential information regarding the Book. Ackerman also interacted with a spreadsheet titled "Jenn company cheat.xlsx," which contains a full list of insurers and contact information and would be useful in moving and servicing business.  Finally, she interacted with a spreadsheet titled "January 2025 Cindy Ackerman," a document that is replete with non-public client contact and policy information.

62.    The last time that she used this flash drive on her Gallagher laptop was on December 19, 2025.

63.    Through the sworn declaration of Ackerman's forensic expert, Gallagher recently learned that Ackerman plugged the laptop into a computer ***other than the one issued to her by Gallagher*** (presumably a personal laptop) on January 19, 2026, eight days before her resignation and accessed Gallagher's valuable trade secret information in the "Cindy book 11 2025.xlsx" and "Denver CO BOB Personal Lines 11.11.25.xlsx" Spreadsheets.

64.    Upon investigation, Gallagher has learned that Ackerman acquired those two spreadsheets from her co-workers after requesting from them a list of all of the clients in the Book "broken down by premium or revenue" on November 11, 2026, purportedly because she wanted to send Christmas gifts to the clients.

20

65.    Ackerman took the two spreadsheets that she received from her co-workers – "Cindy book 11 2025 .xlsx" and "Denver CO BOB Personal Lines 11 .11.25 .xlsx" – and put them on a flash drive.  The last time she accessed them on that flash drive was January 19, 2026, well after she would have needed it for sending Christmas gifts.  Moreover, she accessed the flash drive on a personal computer, which she had no legitimate reason to do because she could have accessed all of this information on Gallagher's computer system.  Finally, Ackerman has stated in her declaration that "[b]y mid-January, it was clear to me that I simply could not stay at AP/Gallagher" and that she was "likely going to resign from Gallagher and join HUB International."  Thus, when she plugged the flash drive into a non-Gallagher computer and accessed these spreadsheets, she already had one foot out the door.

66.    "Cindy book 11 2025 .xlsx" and "Denver CO BOB Personal Lines 11 .11.25 .xlsx" are replete with compilations non-public contact information for hundreds of clients, as well as policy information that would be useful in moving the clients' business to a competitor.

67.    The "Cindy book 11 2025.xlsx" has 4,203 rows and the following columns: AccountName, PolicyAndLineTypes, EffectiveDate, ExpirationDate, LineStatusCode, ProducerCode, IssuingCompanyCode, PremiumPayableCode, PremiumBilled, CommissionBilled, PremiumAnnualized, CommissionAnnualized, Address, PostalCode, City, State, PhoneNumber, PremiumEstimated, CommissionEstimated, and PrimaryEmailAddress.  In other words, it has all of the contact information and policy information that a competitor would want to have to move business.

21

68.     The "Denver CO BOB Personal Lines 11.11.25.xlsx" spreadsheet has the same columns as well as a separate sheet estimating commissions for the entire Book.

69.     The electronic information that Ackerman needed to do her job was available on Gallagher's devices and accounts. Thus, she had no legitimate reason to be accessing highly confidential spreadsheets on a personal flash drive plugged into a personal computer, let alone eight days before resigning and at a time when she had made the decision to leave Gallagher.  In fact, she had no legitimate reason to put these spreadsheets on a thumb drive at all.

70.     Moreover, Ackerman provided misleading-at-best sworn testimony regarding her use of the flash drive.  She testified under oath that "The last time I even recall accessing the flash drive, which was for personal reasons as I recall, was sometime in early January 2026, several weeks before I made the final decision to resign from Gallagher."  In fact, as her own expert explained, the last time she accessed the device was January 19, 2026 and the only files that she was accessing were unambiguously business-related and not personal.

71.     Ackerman did not return this flash drive at the end of her employment. Gallagher will not know the full contents of the flash drive until it obtains the flash drive (or an image of it) in discovery but based on her pattern of behavior, the conclusion is inescapable that Ackerman retained confidential Gallagher materials on that device. Ackerman has rejected repeated requests for Gallagher to conduct a forensic inspection of the flash drive—even an independent forensic vendor imaging the flash drive—so that

22

Gallagher may understand the full scope of what information she accessed and what she did with it.

72.    Not to be left out of this effort to take confidential documents, on or around January 25, 2026, just two days before her resignation from Gallagher, Willing printed dozens of documents totaling over 108 pages. One of the documents Gallagher believes Willing accessed and printed is a spreadsheet titled "Copy of VW New Business List_Repair.xlsx." This document contains confidential Gallagher information including, without limitation, client names, renewal dates, revenue information, and carrier names.

73.    Ackerman also worked to persuade clients to move their business to HUB before she resigned. For instance, a client informed Gallagher Sales Executive Kimala Burcar on February 5 that he had been working with Ackerman at HUB for "a couple weeks," which reflected that Ackerman had solicited and moved this client before resigning. On information and belief, Ackerman mentioned to other clients that she planned to move to HUB and that they should come with her.

74.    Additionally, while its investigation is ongoing, Gallagher is aware of Ackerman having unsuccessfully recruited at least three of her co-workers to come with her to HUB.  This is on top of the likelihood that Ackerman recruited Mackie and Willing at least 30 days before their resignations to leave Gallagher and come with her.

75.    Specifically, Ackerman solicited Personal Lines Manager Jenn Martin ("**Martin**") to join her at HUB. Ackerman, who was Martin's manager for Martin's first seven years with Gallagher and its predecessor entities, told Martin in mid-December 2025 that Ackerman was planning on leaving Gallagher and that Martin should come with

23

her.  This was not a surprise to Martin because Ackerman had been threatening to leave for years.

76.    Ackerman then provided Martin's personal email address to HUB and likely instructed someone at HUB to solicit Martin because on January 9, 2026, Martin received an email solicitation from HUB stating that they wanted to talk to Martin about a potential move to HUB.  Before Ackerman solicited Martin, Martin had not received any outreach from HUB.

77.    After Martin ignored that email, Ackerman stepped up the recruitment campaign by approaching Martin at a Gallagher office on January 13, 2026 to solicit her to leave Gallagher and join HUB. Ackerman's pitch was that she could get Martin a raise from HUB and that HUB would match her other benefits that she was receiving from Gallagher.  When Martin declined this solicitation, Ackerman told Martin that she was making a "big mistake."

78.    Ackerman also solicited Erica Marshall and Lisa Wilber, two other Gallagher employees who worked on the Book.  Ackerman did so on or around January 13, 2026 and did so on her behalf as well as the behalf of HUB.

79.    By engaging in this direct recruiting effort while still employed by Gallagher, Ackerman was violating her fiduciary duties.  Additionally, at a minimum, HUB participated in the process or recruiting Martin, which reflects that it was aware that Ackerman was violating those duties and, at a minimum, did not care.

24

**VI.    The Individual Defendants Resign from Gallagher as Part of Their Unlawful Plan.**

80.    On January 27, 2026, the Individual Defendants resigned in unison. Gallagher accepted those notices effective immediately. Based on their actions, Ackerman, as the leader of the team that included Mackie and Willing, solicited them so that they could help her move the Book to HUB and then service it there.

81.    After their resignations, Gallagher discovered evidence that the Individual Defendants had moved to HUB and had begun to solicit numerous clients in violation of the Agreements.

82.    Following their resignations, the Individual Defendants' attack on Gallagher's business accelerated, building on the work they did for HUB before resigning. Gallagher has received over 800 BOR letters from clients serviced by the Individual Defendants since January 27, 2026. On information and belief, most or all of these clients have moved their business from Gallagher to HUB as a direct result of the Individual Defendants' violations of the Agreements and/or use of Gallagher's Trade Secrets.

83.    Further, Gallagher received at least 10 of these BOR letters within two business days of the Individual Defendants' resignations. The only explanation for the speed at which these clients transitioned their business to HUB is that the Individual Defendants had already instructed them to do so prior to resigning and/or that the Individual Defendants retained Gallagher's trade secret information to solicit clients as fast as possible.

84.　For instance, on January 29, 2026—just two days after her resignation—Ackerman sent the following correspondence to a Gallagher client from her HUB email account:

> Hello Mona
> Vicki and I have transitioned to a new broker this week and reaching out as we would like to maintain our policies with you. I just need to send over a broker of record form to sign so we can do that. Nothing will change on your policies other than the updated brokerage house.
> Assuredpartners was purchased by a larger broker, and it was not a good fit for personal service, that we want to continue.
> Please let me know if you have questions or you are agreeable and we will send that over. You were one of the first people I am reaching out to since we have been together so long.
> Let me know if you want to discuss.
> We need Norma's Safeco auto policy and your policy number as well and we can get that digital form over
> Thanks
> Cindy

(Ex. C).

85.　In this message, Ackerman was using Willing as part of her sales pitch despite the fact that Willing is contractually prevented from servicing this account from the Book.[4] Additionally, Ackerman disparaged Gallagher as being "not a good fit for personal service," which demonstrates her intent to use whatever means she can to persuade clients to move their business to HUB.

---

[4]　In fact, HUB's counsel's sole response to the demand letters sent by Gallagher was to promise a written reply in the future and to claim that "Vicki Willing is not employed by Hub, although she may be in the future," a disingenuous position given that Ackerman has been copying Willing and referring to her in solicitation pitches.

86.     The client's response to Ackerman's message makes clear that Ackerman's solicitation was performed in conjunction with Willing, therefore constituting an indirect solicitation in violation of Willing's Agreement:

> Hi Cindy,
> I had received an email from assured about this. I'm fine doing the broker of record change. You can go ahead and send it over to me. I guess I cc'd Vicki but I'm not sure that email would work. I would like to make sure she is aware of all of this since she was my original contact.

(Ex. C).

87.     The message that Ackerman was soliciting clients in conjunction with Willing also comes through in a message that she sent on the date of her resignation. In that message, Ackerman said that "we just left you a vm," confirming that she was making calls with Willing. Ackerman repeated the line that Gallagher "was not a good fit for personal service."  Gallagher only became aware of this exchange because the client copied Willing's Gallagher email address on her response. When Ackerman realized that she had replied to all and that Gallagher would become aware of the exchange, she attempted to recall the message in an effort to cover her tracks. (Ex. D.)

88.     Moreover, Willing was still employed by AP when these activities took place. Trying to conceal her illegal conduct as Ackerman had, Willing deleted the emails as one of her last acts as a Gallagher employee.

89.     One day later, Willing called another client from the Book in an effort to move her business, as evidenced by the fact that the client emailed Willing at her Gallagher address stating "I can give you a call when we get back or if there's a sense of urgency, please send me an email regarding the changing of the guard."  (Ex. E.)

27

90.     Mackie was also involved in the movement of the Book. One such example is that she responded to a January 26, 2026 email from Ackerman about a quote with "I can quote it and refer it I guess and then just get the BOR tomorrow?" This represents Mackie's intent to seek a BOR letter from the client on the following day to move its business to HUB. More generally, Ackerman has been copying Mackie on emails with clients from the Book, further confirming that she intends to have both Willing and Mackie service the clients.

91.     In another instance, on February 5, 2026, a client informed Gallagher that they were ". . . aware that Cindy moved to another agency and ask to transfer our properties insurance agency." (Ex. F). Upon information and belief, Ackerman retained this client's non-public contact information so that she could solicit him after her resignation.

92.     Numerous other clients who have sent BOR requests to Gallagher have informed Gallagher that they intended to move their business to HUB based on Ackerman's solicitation. On information and belief, Willing and Mackie have worked with Ackerman to solicit these clients on behalf of HUB in direct violation of the Agreements, which prohibit such indirect solicitation. Ackerman's role in aiding these breaches of contract, despite her awareness of the Agreements' restrictive covenants, also constitutes tortious interference with contract.

93.     Even more distressingly, the large volume of Gallagher clients who have been solicited by the Individual Defendants makes clear that the Individual Defendants are in possession of Gallagher Trade Secrets and Confidential Information (including the

Flash Drive Spreadsheets) in violation of the Agreements and applicable law. It is impossible that the Individual Defendants have memorized the email addresses and phone numbers for the over 1,800 lines in the Book. Rather, they are in possession of documents reflecting such information. This is made even more apparent by the fact that the Individual Defendants' clients are primarily comprised of individuals and families. In other words, these clients' contact information was not readily available online. It is evident that the Individual Defendants have maintained Gallagher's proprietary information as part of their efforts to unfairly compete with Gallagher.

94.     On information and belief, Ackerman also stored large volumes of Gallagher Trade Secrets and Confidential Information in her personal cell phone in the form of detailed contact information for the clients in the Book. This may have taken the form of simply adding new "contacts" to her cell phone's contact directory by using the Flash Drive Spreadsheets. In this manner, storage of Gallagher Trade Secrets and Confidential Information is no different than if Ackerman maintained an Excel spreadsheet with the same information.  The result is the same: illegal possession and use of Gallagher Trade Secrets.

95.     On information and belief, the Individual Defendants have taken this course of action at the instruction of HUB (or at least with its knowledge and consent), who hired the Individual Defendants and have done little or nothing to ensure that Willing and Mackie comply with their restrictive covenants. Rather than lawfully competing with Gallagher, HUB has chosen to cut corners by inducing a high-performing business unit to join HUB

29

and unfairly poach Gallagher's clients so that HUB can profit from the investment Gallagher has made in its employees and clients.

96.    Moreover, HUB knows from its own experience that Ackerman could not have possibly memorized the contact information of hundreds of clients such that when she immediately started soliciting the clients in the Book by calling them for 12 hours per day straight after resigning, she was using information that HUB itself has held in multiple legal filings is a trade secret in the insurance brokerage business.  As such, HUB has endorsed and validated the actions of its highly compensated, management-level employee.

97.    Indeed, HUB should know that the legitimate interests that Gallagher is seeking to protect here are critical because it filed a similar action against two former employees (Leo Portes and Anthony Blanco) in the United States District Court for the Southern District of Florida in which it seeks to enforce similar non-solicitation and non-servicing agreements and to protect client information that is similar to the Trade Secrets at issue in this matter.

98.    "HUB would almost certainly disagree with Ackerman's sworn contention that "[a]s it relates to personal lines insurance and me specifically, I do not understand how Gallagher could possess any trade secrets."

99.    As a result of these actions, Gallagher, through counsel, demanded that Defendants cease and desist their improper conduct on January 30, 2026. (Ex. G). To the extent that they were not aware already, HUB and Ackerman had notice of the Agreements no later than this date.

30

100.    Despite this knowledge, HUB and Ackerman have continued to knowingly and intentionally interfere with Gallagher's contractual rights in a manner that is harmful to Gallagher for HUB's own benefit.

101.    Ackerman's scorched-earth campaign has continued unabated to this day. For months, Ackerman has made false and disparaging statements about Gallagher to Gallagher's clients as part of her scheme to poach those clients.

102.    In or about March 2026, a Gallagher client who moved to HUB told Gallagher that the people with whom she was talking at HUB "described the company [Gallagher] that has taken over who used to manage my policies being managed by call centers now out of India.  If that's correct, then I would like to leave it just the way it is where I've changed to the reps that I'm familiar with and know my policies.  If they've misled me, give me a call back."  Ackerman's statements that policies for the clients in the Book were being managed out of call centers in India is false.  Ackerman knew or should have know that those statements were false when she made them.

103.    In or around April 2026, Ackerman told a Gallagher client that if the client remained with Gallagher for the client's insurance services, the client's account would be handled by a call center, not by the Gallagher account managers with whom the client had previously worked.  That is a false statement, and Ackerman knew or should have known that it was false when she made it.

104.    Ackerman has also told one or more clients in the Book that, if they moved to HUB, their business will continue to be serviced by the team that serviced them at Gallagher.  As a result of statements like that, Martin has received expressions of surprise

31

from clients that she is still with Gallagher as the clients had been led to believe that the entire service team was going with Ackerman from Gallagher to HUB.

105. On information and belief, Ackerman (with HUB's knowledge or, at the very least, acquiescence) has continued a campaign of lies and misinformation about Gallagher's business and the services it is providing its clients in an effort to unlawfully interfere with Gallagher's business.

106. Further, Willing has continued her solicitation and/or service of Gallagher clients, in violation of her obligations under the Agreement.

107. Numerous clients from the Book have confirmed to Gallagher personnel that they were moving their business to "Vicki."

108. On March 16, 2026, a former Gallagher client responded to Gallagher's outreach "[c]onfirming transfer of account back to Vicki [Willing] at hub."

109. On March 18, 2026, another former Gallagher client responded to Gallagher's outreach confirming that they "have decided to continue working with Vicki [Willing] at Hub."

110. On March 18, 2026, yet another former Gallagher client responded to Gallagher's outreach "regarding the transfer of our home/auto insurance policies to Vicki [Willing]/HUB. Vicki has been our insurance representative since we relocated to Denver. We have been extremely satisfied with her service so we decided to move our policies with her to new company."

111. On March 30, 2026, a Gallagher client told Martin "Thanks, Jenn. I will move with Vicki/HUB."

32

112.   On March 31, 2026, a Gallagher client told Martin "Please move this account to Vickki/HUB [sic]."

113.   On April 30, 2026, a Gallagher client told Lori Smith, a Senior Account Manager with Gallagher, that she wanted to go with "the team I already know."

114.   As recently as May 11, 2026, a former Gallagher client reached out to Ackerman and Willing about an auto policy and accidentally sent the email to Willing's Gallagher email address.  This is yet another example of a client from the Book who is either working with Willing or has at least been led to believe that he is being serviced by her.

115.   Again, these are examples only and Gallagher anticipates discovery will reveal a broader campaign by Willing (and all Defendants) to violate her Agreement.

116.   In summary, Gallagher has determined that the Individual Defendants have violated their duties of loyalty to Gallagher by transitioning clients from the Book to HUB before their resignations and that Willing and Mackie have breached the Agreements by directly and indirectly soliciting clients with whom they worked at Gallagher on behalf of HUB.  They collaborated with Ackerman to accomplish these goals, and Ackerman assisted them with their breaches of contract. Finally, Defendants have misappropriated Gallagher Trade Secrets and Confidential Information in order to use the contact information for numerous clients for unlawful solicitations.

117.   Gallagher has been irreparably damaged in numerous ways.  First, it lost client relationships because it had a trio of disloyal employees diverting business away

33

from it.   Gallagher's relationships with clients have been damaged by the Individual Defendants acting in unauthorized ways.

118.   Additionally, Gallagher has been irreparably damaged by the Individual Defendants' improper disclosure and use of Gallagher Trade Secrets and Confidential Information on behalf of HUB. State and federal trade secret statutes specifically authorize the issuance of injunctive relief because of the irreparable injury that is likely to occur if a departing employee like Ackerman takes and uses highly confidential information on behalf of a competitor.

119.   HUB has chosen to accept the benefits of Ackerman's trade secret misappropriation and Willing's violations of her Agreement because it would rather benefit from the business in the Book than meaningfully restrain its new employees.

120.   Finally, Gallagher is only aware of the tip of the iceberg with respect to Defendants' competitive acts.   Gallagher has only learned of Defendants' activities through BOR letters and email communications erroneously sent to the Individual Defendants' Gallagher email accounts. Indeed, in the three months since Gallagher filed its initial Complaint in this action, ECF No. 1, it has learned more about the scope of Defendants' illegal campaign, which is ongoing.  It expects that further investigation and discovery will reveal substantially more evidence of unlawful conduct.

## COUNT ONE
### BREACH OF FIDUCIARY DUTY
### (AGAINST ACKERMAN)

121.   Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

34

122.    By virtue of Ackerman's status as Vice President, she operated as a fiduciary with respect to Gallagher's business and owed Gallagher a fiduciary duty to exercise the utmost good faith and loyalty in the performance of her duties and to act solely for the benefit of Gallagher with respect to all matters related to her employment.

123.    The above-described conduct constitutes a breach of Ackerman's fiduciary duty to Gallagher.  Ackerman breached her fiduciary duty to Gallagher by, among other things, engaging in misconduct that served her own self-interest and the interests of commercial adversaries (such as HUB) rather than the interests of Gallagher and acted in a manner inconsistent with the best interests of Gallagher by diverting the business of Gallagher clients to HUB before her resignation.

124.    Additionally, Ackerman recruited at least three co-workers to resign from Gallagher and join HUB (apart from likely having recruited Mackie and Willing), which also violated her fiduciary duty.

125.    As a direct and proximate result of Ackerman's breach of her fiduciary duties, Gallagher has incurred damages.  Gallagher is also entitled to recovery of all compensation paid to Ackerman during her period of disloyalty.

126.    The actions of Ackerman, as alleged in Count One, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

## COUNT TWO
### BREACH OF DUTY OF LOYALTY
### (AGAINST ACKERMAN)

127.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

128.    By virtue of Ackerman's status as Vice President, Ackerman operated as a fiduciary with respect to Gallagher's business and owed Gallagher a fiduciary duty to exercise the utmost good faith and loyalty in the performance of her duties and to act solely for the benefit of Gallagher with respect to all matters related to her employment.

129.    The above-described conduct constitutes a breach of Ackerman's duty of loyalty to Gallagher.  Ackerman breached her duty of loyalty to Gallagher by, among other things, engaging in misconduct that served her own self-interest and the interests of commercial adversaries (such as HUB) rather than the interests of Gallagher and acted in a manner inconsistent with the best interests of Gallagher by diverting the business of Gallagher clients to HUB prior to her resignation.

130.    Additionally, Ackerman recruited at least three co-workers (and likely more) to resign from Gallagher and join HUB, which also violated her duty of loyalty.

131.    As a direct and proximate result of Ackerman's breaches of her duty of loyalty, Gallagher has incurred damages.  Gallagher is also entitled to recovery of all compensation paid to Ackerman during her period of disloyalty.

132.    The actions of Ackerman, as alleged in Count Two, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

36

## COUNT THREE
### BREACH OF CONTRACT
### (AGAINST WILLING AND MACKIE)

133.    AP incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

134.    As a condition of the commencement of their employment with AP (now Gallagher), Willing and Mackie executed the Agreements.

135.    The Agreements are valid and enforceable contracts that prohibit Willing and Mackie from (among other things): (a) using, disclosing, or retaining any of Gallagher's Confidential Information except for Gallagher's benefit; or (b) soliciting or servicing certain Gallagher clients (whether directly or indirectly).

136.    Gallagher has met its obligations to Willing and Mackie under the Agreements.

137.    The above-described conduct constitutes breaches Willing's and Mackie's contractual obligations to Gallagher.  Willing and Mackie breached the Agreements by, among other things, soliciting and servicing Gallagher's clients on behalf of HUB, a direct competitor, as well as by using and/or disclosing Gallagher's Confidential Information for acts in competition with Gallagher.

138.    As a direct and proximate result of Willing's and Mackie's actions in breach of the Agreements, Gallagher has sustained and will continue to sustain damages.

139.    Gallagher is faced with irreparable injury because of Willing's and Mackie's actions, as they threaten Gallagher with damages for which it cannot be made completely whole.

37

140.    Under the terms of the Agreements, Gallagher is entitled to recover its attorneys' fees incurred in this action.

## COUNT FOUR
### TORTIOUS INTERFERENCE WITH CONTRACT[5]
### (AGAINST ACKERMAN AND HUB)

141.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through __ of this Amended Complaint as if fully set forth herein.

142.    As a condition of the commencement of their employment with AP (now Gallagher) and in exchange for substantial compensation, Willing and Mackie executed the Agreements.

143.    The Agreements are valid and enforceable contracts that prohibit Willing and Mackie from (among other things) (a) using, disclosing, or retaining any of Gallagher's Confidential Information except for Gallagher's benefit; or (b) soliciting or servicing certain Gallagher clients (whether directly or indirectly).

144.    Ackerman has been aware of the existence of the Agreements because she worked closely with Willing and Mackie at Gallager and received notice of Willing and Mackie's obligations under the Agreements.

145.    HUB has been aware of the existence of the Agreements.  At the latest, HUB gained knowledge of the Agreements on January 30, 2026, when it received

---

[5]    For the avoidance of doubt, Gallagher's tortious interference claims against Ackerman and HUB are not based on Gallagher's trade secrets claims.  Rather, Gallagher's tortious interference claims are based on Willing and Mackie's breach of their confidentiality, misuse of confidential information, and violation of the non-solicitation and non-service obligations in the Agreements and the scheme between Ackerman, HUB, and Willing and Mackie to breach the Agreements.

correspondence from Gallagher's counsel detailing Willing and Mackie's obligations under the Agreements.

146. The above-described conduct constitutes tortious interference with Willing's and Mackie's contractual obligations to Gallagher. By concocting and participating in a scheme with Willing and Mackie to move Gallagher's clients over to HUB (and by compensating them for doing so) and to service those Gallagher clients on a going forward basis once the Gallagher clients came over to HUB, HUB intentionally interfered with the Agreements between Willing and Mackie on the one hand and Gallagher on the other, and it induced them to breach the Agreements. Those breaches continue to this day.

147. By participating in a scheme with Willing and Mackie to move Gallagher's clients over to HUB, and by directly soliciting Gallagher clients covered by the Agreements at the direction of, and in collaboration with, Willing and Mackie, Ackerman intentionally interfered with the Agreements between Willing and Mackie on the one hand and Gallagher on the other, and she induced them to breach the Agreements. Those breaches continue to this day.

148. HUB and Ackerman have no justification for their intentional interference with the Agreements.

149. As a direct and proximate result of the actions of HUB and Ackerman, Gallagher has sustained and/or will suffer damages.

150.    The conduct of Ackerman and HUB was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Gallagher, entitling Gallagher to an award of punitive damages.

**COUNT FIVE**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1831 *ET SEQ.*)**
**(AGAINST ACKERMAN, WILLING, AND HUB)**

151.    AP incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

152.    The client information that Ackerman and Willing stole from Gallagher for use at HUB (and to HUB's financial benefit) – such as the Flash Drive Spreadsheets, the remaining contents of the flash drive that Ackerman was using in November/December/January 2025 and that she did not return at the end of her employment and has refused to return since, and the "Copy of VW New Business List_Repair.xlsx" – are trade secrets of Gallagher subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq.*

153.    Although Gallagher does not yet know the full scope of its Trade Secrets that Ackerman and Willing stole and are misusing, at a minimum Gallagher knows the Trade Secrets at issue include (without limitation) the three Flash Drive Spreadsheets and the "Copy of VW New Business List_Repair.xlsx".

154.    The materials taken by Ackerman and Willing are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.  Gallagher has spent significant sums, in terms of both financial and

human resources, to develop and maintain this information, which would be of great value to any competitor.

155.    The client information at issue is related to products or services used in, or intended for use in, interstate commerce.

156.    Gallagher takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include:

    a.   handbook and IT policies;

    b.   restricting availability of certain confidential information to key employees;

    c.   requiring employees to execute agreements with confidentiality provisions and restrictive covenants;

    d.   physical security measures to protect against the disclosure of sensitive materials to third parties; and

    e.   IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

157.    Ackerman and Willing obtained and used the information contained in these files and data by improper means in violation of their contractual and other obligations to Gallagher. Indeed, Ackerman and Willing have demonstrated that they are using such information by contacting in rapid fashion numerous Gallagher clients, whose contact information and information about their insurance policies, preferences, and renewal

dates would not be available to Ackerman and Willing in absence of such misappropriation.

158.    Ackerman and Willing engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duties Ackerman and Willing owed and continue to owe Gallagher as agents, employees, and representatives of Gallagher.

159.    Ackerman and Willing acted as agents of HUB in their acts of misappropriation.

160.    Moreover, HUB knows that Ackerman could not have possibly memorized the contact information of hundreds of clients such that when she immediately started soliciting the clients in the Book by calling them for 12 hours per day straight after resigning, she was using information that HUB itself has stated is a trade secret in the insurance brokerage business.  As such, HUB has endorsed and validated the actions of its highly compensated, management-level employee.

161.    Ackerman's, Willing's, and HUB's foregoing conduct constitute actual and threatened misappropriation and misuse of Gallagher's trade secret information in violation of the DTSA.

162.    As a direct and proximate result of Ackerman's, Willing's, and HUB's misappropriation, Gallagher has suffered and/or will suffer damages and irreparable harm, and is entitled to injunctive relief, damages, attorneys' fees, costs, and remedies permitted under the DTSA.

42

163.    Each of the acts of misappropriation, as alleged in Count Five, was done willfully and maliciously by Ackerman, Willing, and HUB, thereby entitling AP to exemplary damages to be proved at trial and recovery of its attorneys' fees.

**COUNT SIX**
**VIOLATION OF THE COLORADO UNIFORM TRADE SECRETS ACT**
**(COLO. REV. STAT. ANN. §§ 7-74-101 *ET SEQ.*)**
**(AGAINST ACKERMAN, WILLING, AND HUB)**

164.    AP incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

165.    The client information that Ackerman and Willing stole from Gallagher for use at HUB (and to HUB's financial benefit) – such as the Flash Drive Spreadsheets, the remaining contents of the flash drive that Ackerman was using in November/December 2025 and that she did not return at the end of her employment and has refused to return since, and the "Copy of VW New Business List_Repair.xlsx" – are trade secrets of Gallagher subject to protection under the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. Ann. §§ 7-74-101 *et seq.*

166.    Although Gallagher does not yet know the full scope of its Trade Secrets that Ackerman and Willing stole and are misusing, at a minimum Gallagher knows the Trade Secrets at issue include (without limitation) the three Flash Drive Spreadsheets and the "Copy of VW New Business List_Repair.xlsx".

167.    The materials taken by Ackerman and Willing are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.  Gallagher has spent significant sums, in terms of both financial and

human resources, to develop and maintain this information, which would be of great value to any competitor.

168.    Gallagher takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include:

    a.  handbook and IT policies;

    b.  restricting availability of certain confidential information to key employees;

    c.  requiring employees to execute agreements with confidentiality provisions and restrictive covenants;

    d.  physical security measures to protect against the disclosure of sensitive materials to third parties; and

    e.  IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

169.    Ackerman and Willing obtained and used the information contained in these files and data by improper means in violation of their contractual and other obligations to Gallagher. Indeed, Ackerman and Willing have demonstrated that they are using such information by contacting in rapid fashion numerous Gallagher clients, whose contact information and information about their insurance policies, preferences, and renewal dates would not be available to Ackerman and Willing in absence of such misappropriation.

44

170.    Ackerman and Willing engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duties Ackerman and Willing owed and continue to owe Gallagher as agents, employees, and representatives of Gallagher.

171.    Ackerman and Willing acted as agents of HUB in their acts of misappropriation.

172.    Moreover, HUB knows that Ackerman could not have possibly memorized the contact information of hundreds of clients such that when she immediately started soliciting the clients in the Book by calling them for 12 hours per day straight after resigning, she was using information that HUB itself has stated is a trade secret in the insurance brokerage business.  As such, HUB has endorsed and validated the actions of its highly compensated, management-level employee.

173.    Ackerman's, Willing's, and HUB's foregoing conduct constitute actual and threatened misappropriation and misuse of Gallagher's trade secret information in violation of the CUTSA.

174.    As a direct and proximate result of Ackerman's, Willing's, and HUB's misappropriation, Gallagher has suffered and/or will suffer damages and irreparable harm, and is entitled to injunctive relief, damages, attorneys' fees, costs, and remedies permitted under the CUTSA.

175.    Each of the acts of misappropriation, as alleged in Count Six, was done willfully and maliciously by Ackerman, Willing, and HUB, thereby entitling AP to exemplary damages to be proved at trial and recovery of its attorneys' fees..

45

## COUNT SEVEN
### DECEPTIVE TRADE PRACTICES
### (COLO. REV. STAT. ANN. §§ 6-1-101 *ET SEQ.*)
### (AGAINST ACKERMAN AND HUB)

176.   Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

177.   Ackerman and HUB have engaged in a campaign of spreading knowingly false lies to Gallagher's clients as part of Defendants' scheme to steal Gallagher's clients and move them to HUB.

178.   As part of her business with HUB, Ackerman has repeatedly told Gallagher clients in the Book that Gallagher is outsourcing management of its insurance products to foreign call centers.

179.   As part of her business with HUB, Ackerman has repeatedly told Gallagher clients in the Book that they would be serviced at HUB by Willing and/or the same team that serviced them at Gallagher.

180.   The purpose of these false statements is to imply that Gallagher's top-notch client service will be diminished, that the Gallagher clients Defendants are trying to steal will be unhappy with the service they receive if they stay at Gallagher, and that they will have continuity of service if they move to HUB.

181.   These statements disparage the services Gallagher offers to its clients.

182.   At least one Gallagher client has expressly told Gallagher that the Individual Defendants' false representations regarding the offshoring of Gallagher's management of its insurance products was the reason she elected to move from Gallagher to HUB.

183.    Gallagher's investigation remains ongoing, but given the ongoing campaign by Defendants to steal Gallagher's clients through whatever means necessary, Gallagher anticipates uncovering additional false statements regarding Gallagher's products or services made by the Individual Defendants.

184.    HUB has approved, either explicitly or implicitly, this campaign of false statements directed to Gallagher clients.

185.    Gallagher has been harmed by Defendants' unfair and deceptive trade practices in an amount to be determined at trial.

## COUNT EIGHT
### UNJUST ENRICHMENT
### (All Defendants)

186.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

187.    As a result of their misconduct as alleged in this Complaint, Defendants have been unjustly enriched by converting Gallagher's clients to their own purposes and benefits at Gallagher's expense.[6]

188.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

---

[6]    Gallagher pleads this claim in the alternative to the extent that Gallagher does not receive complete relief under the Agreements.

47

## COUNT NINE
### CIVIL CONSPIRACY
### (All Defendants)

189.    Gallagher incorporates by reference its allegations set forth in paragraphs 1 through 120 of this Amended Complaint as if fully set forth herein.

190.    Defendants each agreed with one another that they would divert Gallagher's clients for their own profit and that they would collaborate in doing so in violation of Defendants' contractual, statutory and common law obligations.

191.    Defendants were aware that the confidential, proprietary and trade secret information of Gallagher to be extremely valuable in moving Gallagher business while causing harm to Gallagher.

192.    To that end, Defendants had a meeting of the minds with the object of accomplishing the unlawful conduct stated in this Amended Complaint.

193.    Defendants performed one or more unlawful, overt acts in furtherance of accomplishing their objective, as set forth herein.

194.    Gallagher has suffered damages as a result of this conspiracy.

195.    By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Gallagher thereby, each defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each defendant/co-conspirator.

196.    The actions of Defendants, as alleged in Count Nine, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Gallagher.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Arthur J. Gallagher & Co. and AssuredPartners of Colorado, LLC request that this Court provide them with injunctive relief and money damages against Defendants in the following forms:

a.    Entry of a temporary restraining order, a preliminary injunction, and a permanent injunction against Defendants requiring that Mackie and Willing comply with their post-employment contractual restrictions and that Ackerman and HUB do not take any steps to induce or participate in further breaches of those restrictions;

b.    Entry of a temporary restraining order, a preliminary injunction, and a permanent injunction against Defendants requiring that they return to Gallagher all materials containing Gallagher Trade Secrets retained by the Individual Defendants at the end of their employment and that they refrain from any further use or disclosure of Gallagher Trade Secrets retained by the Individual Defendants at the end of their employment (including any intellectual property derived from Gallagher Trade Secrets);

c.    An award of actual and compensatory damages in an amount to be proven at trial;

d.    An award of damages for unjust enrichment in an amount to be proven at trial;

e.    In lieu of damages measured by other methods, an award of reasonable royalties for the Defendants' unauthorized use or disclosure of Gallagher's confidential information and Trade Secrets;

f.    An award of disgorgement of compensation paid to Individual Defendants during any period in which they violated their fiduciary duties to Gallagher;

g.    An award of exemplary and punitive damages to be proven at trial;

h.    Pre-judgment and post-judgment interest;

i.      An award of reasonable attorneys' fees and costs incurred in this action; and

j.      Such other relief as is just and proper.

Respectfully submitted,

FISHER & PHILLIPS LLP

/s/     Michael P. Elkon
Michael R. Greco
mgreco@fisherphillips.com
1125 17th Street, Suite 2400
Denver, Colorado 80202
(303) 218-3655 Telephone
(303) 218-3651 Facsimile

Michael P. Elkon, GA Bar No. 243355
melkon@fisherphillips.com
Matthew T. Sharon, GA Bar No. 723611
msharon@fisherphillips.com
1230 Peachtree Street, NE, Suite 3300
Atlanta, Georgia 30309
(404) 231-1400 Telephone
(404) 240-4249 Facsimile

Christopher J. Merken, PA Bar No. 329814
cmerken@fisherphillips.com
Two Logan Square
100 North 18th Street, 12th Floor
Philadelphia, Pennsylvania 19103
(610) 230-2150 Telephone
(610) 230-2151 Facsimile

ATTORNEYS FOR PLAINTIFFS